[No. S044323. June 17, 1996.]

THE PEOPLE, Plaintiff and Respondent, v.
BRIAN RAY FLETCHER et al., Defendants and Appellants.

454

COUNSEL

George L. Schraer and Eric S. Multhaup, under appointments by the Supreme Court, for Defendants and Appellants.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Esteban Hernandez, Keith I. Motley, H. Howard Wayne and Warren P. Robinson, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**KENNARD, J.**—The confrontation clause of the Sixth Amendment to the federal Constitution, made applicable to the states through the Fourteenth Amendment, provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." The right of confrontation includes the right of cross-examination. (*Pointer* v. *Texas* (1965) 380 U.S. 400, 404, 406-407 [13 L.Ed.2d 923, 926-927, 927-928, 85 S.Ct. 1065].)

A recurring problem in the application of the right of confrontation concerns an out-of-court confession[1] of one defendant that incriminates not only that defendant but another defendant jointly charged. Generally, the confession will be admissible in evidence against the defendant who made it (the declarant). (See Evid. Code, § 1220 [hearsay exception for party admissions].) But, unless the declarant submits to cross-examination by the other defendant (the nondeclarant), admission of the confession against the nondeclarant is generally barred both by the hearsay rule (Evid. Code, § 1200) and by the confrontation clause (U.S. Const., 6th Amend.). If the two defendants are tried together, the trial court may instruct the jury to consider the confession in determining the guilt only of the declarant, but it may be psychologically impossible for jurors to put the confession out of their minds when determining the guilt of the nondeclarant. The United States Supreme Court has held that, because jurors cannot be expected to ignore one defendant's confession that is "powerfully incriminating" as to a second defendant when determining the latter's guilt, admission of such a confession at a joint trial generally violates the confrontation rights of the nondeclarant. (*Bruton* v. *United States* (1968) 391 U.S. 123, 126-137 [20 L.Ed.2d 476, 479-486, 88 S.Ct. 1620].) Earlier, this court had reached a similar conclusion on nonconstitutional grounds. (*People* v. *Aranda* (1965) 63 Cal.2d 518, 528-530 [47 Cal.Rptr. 353, 407 P.2d 265].)

More recently, however, the United States Supreme Court has stated that the positive authority of *Bruton* v. *United States, supra,* 391 U.S. 123 (holding that the admission, at a joint trial, of a nontestifying defendant's confession implicating a codefendant, even with an appropriate limiting instruction, violates the codefendant's rights under the confrontation clause) extends only to confessions that are not only "powerfully incriminating" but also "facially incriminating" of the nondeclarant defendant. (*Richardson* v. *Marsh* (1987) 481 U.S. 200, 207-208 [95 L.Ed.2d 176, 185-186, 107 S.Ct.

---

[1]The problem is not limited to confessions but extends also to partial admissions of guilt. We use the term "confession" in the text, rather than the more cumbersome "extrajudicial statement," purely for convenience.

1702].) The court held that a defendant's rights under the confrontation clause are not violated by the admission in evidence of a codefendant's confession that has been redacted "to eliminate not only the defendant's name, but any reference to his or her existence," even though the confession may incriminate the defendant when considered in conjunction with other evidence properly admitted against the defendant. (*Id.* at p. 211 [95 L.Ed.2d at p. 188], fn. omitted.) The court expressly declined to decide whether a codefendant's confession that had been redacted by replacing the non-declarant's name with a symbol or neutral pronoun could be admitted in evidence at a joint trial without violating the nondeclarant's rights under the confrontation clause. (*Id.* at p. 211, fn. 5 [95 L.Ed.2d at p. 188].)

We granted review in this case to address the issue expressly reserved in *Richardson* v. *Marsh, supra,* 481 U.S. 200—that is, whether it is sufficient, to avoid violation of the confrontation clause, that a nontestifying codefendant's extrajudicial confession is edited by replacing all references to the nondeclarant's name with pronouns or similar neutral and nonidentifying terms. Such a confession is "facially incriminating" in the sense that it is sufficient by itself, without reference to any other evidence, to incriminate someone other than the confessing codefendant. It is not "facially incriminating" only in the sense that it does not identify this other person by name.

We conclude that whether this kind of editing—which retains references to a coparticipant in the crime but removes references to the coparticipant's name—sufficiently protects a nondeclarant defendant's constitutional right of confrontation may not be resolved by a "bright line" rule of either universal admission or universal exclusion. Rather, the efficacy of this form of editing must be determined on a case-by-case basis in light of the other evidence that has been or is likely to be presented at the trial. The editing will be deemed insufficient to avoid a confrontation violation if, despite the editing, reasonable jurors could not avoid drawing the inference that the defendant was the coparticipant designated in the confession by symbol or neutral pronoun.

Here, the nontestifying codefendant's confession was incriminating in ways that were both sufficiently substantial and sufficiently direct to require its exclusion under the confrontation clause. The confession was substantially (or "powerfully") incriminating because the evidence properly admitted against the nondeclarant defendant at trial raised an issue regarding whether the nondeclarant had entertained a culpable criminal intent at the time of the charged crimes, and the codefendant's confession attributed a culpable intent to his coparticipant. The identification of the nondeclarant as the coparticipant mentioned in the confession was sufficiently direct (or

"facial"), even though the confession referred to the coparticipant only as "a friend," because the evidence at trial was such that a reasonable juror could not help but infer that the nonconfessing defendant was the "friend" mentioned in the confession. In this situation, the risk is unacceptably great that jurors would be unable to follow the trial court's instruction to disregard the confession in determining the nondeclarant's guilt. Accordingly, the Court of Appeal correctly concluded that admission of the redacted statement violated the defendant's rights under the confrontation clause.

## I

Defendant Terrance Kent Moord and codefendant Brian Ray Fletcher were twice jointly tried for the murder and attempted robbery of Maria Estrada, who was fatally shot on June 20, 1991, as well as for other crimes that are not relevant to the issue we consider here. The jury at the initial trial was unable to reach verdicts on the murder and attempted robbery charges, although it did resolve some of the other charges. At a second trial, both defendants were convicted of the murder and attempted robbery charges.

### A. The Prosecution's Evidence at Trial

Lorenzo Garcia was driving a taxi shortly after 1:30 a.m. on June 20, 1991, when the taxi stalled on a freeway on-ramp. Garcia parked the taxi on the side of the ramp close to the guardrail, locked the taxi, and walked home.

Shortly before 2:40 a.m., Maria Estrada encountered the taxi while driving on the same on-ramp. The taxi was no longer parked against the guardrail but instead was angled into the roadway, and there were two men near it. Estrada stopped and asked them if there was a problem. With Estrada in the car were her seven- and nine-year-old sons, her four-year-old daughter, her fourteen-year-old brother, and her mother.

One of the men approached and asked if Estrada had jumper cables. Estrada said she did not. This man repeated his question in a harsher tone. Estrada started to drive away. The man to whom she had been speaking produced a gun and fired at Estrada from close range, fatally wounding her. As the shot was fired, or shortly before, passengers in Estrada's car heard one of the men say "Oh, no." The two men fled.

At approximately 2:40 a.m., Shirley Forest was awakened by banging on the door and window of her apartment, which was located very near the on-ramp where the shooting occurred. Opening her door, Forest found codefendant Fletcher, who was a friend of her nephew, and defendant

Moord. Forest refused Fletcher's request that he and Moord be allowed to stay the night, but she called a taxi for the two men. While the two men were waiting in Forest's apartment, Forest saw Fletcher pick up a gun that had dropped from his jacket.

Fletcher and Moord left Forest's apartment in a taxi at 3:12 a.m. A little while later, they turned up at the apartment of Fletcher's former girlfriend Tambushia Hewitt, where they spent the rest of the night. Fletcher told Hewitt that something had happened and that he hoped no one was dead.

Investigation at the scene of the shooting revealed that the antenna of Garcia's taxi had been removed and apparently used to unlock its doors. Some shoe prints at the scene were consistent with shoes that Moord was wearing when arrested; other shoe prints at the scene were consistent with shoes that Fletcher had left with Hewitt after the shooting.

While in custody awaiting trial, Fletcher made statements to fellow inmate Roland Kramer incriminating both himself and Moord. At the second trial, Kramer described Fletcher's statements this way: "[Fletcher] told me that he and a friend were on a freeway ramp and had a cab or a vehicle—like there was a cab or something there, and they were using jumper cables or some kind of ruse to get people to stop" and "that they were doing that so when people would stop that they could rob them, take their money." According to Kramer, Fletcher had also said that "this woman had slowed down and stopped, and . . . as she drove away he shot at her," and that he was facing murder charges because the woman had died.

## B. *Defense Evidence at Trial*

Neither defendant testified. Moord presented expert testimony challenging the prosecution's shoe print evidence. Fletcher presented evidence, through the testimony of two other jail inmates, that Kramer had a grudge against Fletcher and may have fabricated Fletcher's confession after learning the circumstances of the shooting by reading a transcript of the preliminary hearing.

## C. *Procedural History—Motions to Sever, Redact, or Exclude*

Before the first trial, Moord's counsel moved to sever Moord's trial from that of codefendant Fletcher on the basis that admission of Fletcher's out-of-court statements at a joint trial at which Fletcher did not testify would violate Moord's constitutional right of confrontation. The trial court denied the severance motion; it indicated it would decide at trial any issue regarding

the admissibility of Fletcher's jailhouse confession. At trial, Moord's counsel requested that evidence of Fletcher's jailhouse confession be edited to remove all references to Moord and also that the jury be instructed to consider the evidence only against Fletcher. Moord's counsel also argued that any reference to a second person being with Fletcher at the time of the shooting would be prejudicial to Moord, even if the statement did not refer to Moord by name, because other evidence placed Moord with Fletcher at the crime scene. The trial court ordered that during testimony about the jailhouse admissions, any references in those admissions to a second person be by way of a pronoun or as "another person." The trial court also admonished the jury that any statement by codefendant Fletcher could not be used in any way against defendant Moord. Kramer testified at the first trial that Fletcher had said that "they were using the ruse of needing a jump . . . to get people to stop" and that Fletcher had admitted shooting a woman who stopped her car.

Before the retrial, counsel for defendant Moord again moved to sever Moord's case from that of codefendant Fletcher. The trial court again denied the motion. During the retrial, Moord's counsel renewed the severance motion, which the trial court again denied. As noted above, Kramer testified at the second trial that "[Fletcher] told me that he and a friend were on a freeway ramp and had a cab or a vehicle—like there was a cab or something there, and they were using jumper cables or some kind of ruse to get people to stop" and "that they were doing that so when people would stop that they could rob them, take their money." The trial court instructed the jury that this testimony was admissible against Fletcher but not against Moord.

The jury at the second trial convicted Moord and Fletcher of first degree murder (Pen. Code, §§ 187, 189) and attempted second degree robbery (id., §§ 211, 212.5, 664). As to Fletcher alone, the jury found true the special circumstance of murder in the commission of an attempted robbery (id., § 190.2, subd. (a)(17)). The court sentenced Fletcher to life imprisonment without possibility of parole for the murder and to an additional and consecutive determinate term for an unrelated offense and for certain enhancements. The court sentenced Moord to a term of 25 years to life for the murder, and it imposed an additional and consecutive determinate term for certain unrelated offenses and enhancements.

Both defendants appealed. The Court of Appeal consolidated the appeals for argument and disposition. As to Moord, the Court of Appeal reversed his convictions for murder and attempted robbery and affirmed his convictions for unrelated offenses. The reversal was based on the Court of Appeal's

conclusion that admission of Fletcher's statements to Kramer violated Moord's Sixth Amendment right of confrontation.[2]

## II

Before this court's 1965 decision in *People* v. *Aranda, supra,* 63 Cal.2d 518, California had followed the rule that in a joint trial of two defendants, a confession by one that implicated both was admissible in evidence, provided only that the trial court instructed the jury to disregard the confession when determining the guilt or innocence of the nondeclarant. (See *People* v. *Ketchel* (1963) 59 Cal.2d 503, 532-534 [30 Cal.Rptr. 538, 381 P.2d 394].) In *Aranda,* however, we acknowledged that this procedure had been criticized on the ground that it required jurors to perform a " 'mental gymnastic' " that was beyond their powers (*People* v. *Aranda, supra,* at p. 525), and we concluded that jurors "should not be permitted to be influenced by evidence against a defendant that as a matter of law they cannot consider but as a matter of fact they cannot disregard" (*id.* at p. 528).

Without deciding whether the past practice was constitutionally permissible, we concluded in *Aranda* that it was "prejudicial and unfair to the nondeclarant defendant and must be altered." (*People* v. *Aranda, supra,* 63 Cal.2d 518, 530.) We adopted "judicially declared rules of practice" for all cases in which the prosecution proposed to introduce in evidence an extrajudicial statement of one defendant that implicated a codefendant. (*Ibid.*) In these cases, we said, the trial court must either (1) permit a joint trial "if all parts of the extrajudicial statements implicating any codefendants can be and are effectively deleted without prejudice to the declarant"; (2) sever the trials "if the prosecution insists that it must use the extrajudicial statements and it appears that effective deletions cannot be made"; or (3) permit a joint trial but exclude the extrajudicial statement if effective deletions cannot be made. (*Id.* at pp. 530-531.) We explained that "effective deletions" meant removal of "not only direct and indirect identifications of codefendants but any statements that could be employed against nondeclarant codefendants once their identity is otherwise established." (*Id.* at p. 530, fn. omitted.)

Some three years later, in 1968, the United States Supreme Court reached a similar conclusion as a matter of constitutional law. In *Bruton* v. *United States, supra,* 391 U.S. 123, the high court, overruling its previous decision in *Delli Paoli* v. *United States* (1957) 352 U.S. 232 [1 L.Ed.2d 278, 77 S.Ct. 294], held that a defendant's right of cross-examination secured by the confrontation clause of the Sixth Amendment is violated by the admission of

---

[2]The Court of Appeal reversed the murder and attempted robbery convictions of codefendant Fletcher as well, but for reasons unrelated to the issue we consider here.

a nontestifying codefendant's confession implicating the defendant, even though the jury is instructed to disregard the confession in determining the defendant's guilt or innocence. The court remarked that "there are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored. [Citations.] Such a context is presented here, where the powerfully incriminating extrajudicial statements of a codefendant, who stands accused side-by-side with the defendant, are deliberately spread before the jury in a joint trial." (*Bruton* v. *United States*, *supra*, at pp. 135-136 [20 L.Ed.2d at p. 485].)

The issue was again before the United States Supreme Court in 1987 in *Richardson* v. *Marsh*, *supra*, 481 U.S. 200. There, the precise issue was whether a defendant's rights under the confrontation clause could be adequately protected by redacting a codefendant's confession to eliminate all references to the defendant. To understand the court's reasoning and the scope and implications of its holding, it is helpful to review the facts before the court.

The case involved a petition for writ of habeas corpus by Clarissa Marsh after a jury had convicted her "of two counts of felony murder in the perpetration of an armed robbery and one count of assault with intent to commit murder." (*Richardson* v. *Marsh*, *supra*, 481 U.S. 200, 205 [95 L.Ed.2d 176, 184].) Marsh had been jointly charged with Benjamin Williams and Kareem Martin. The victims of the charged offenses were Cynthia Knighton, her four-year-old son, and Ollie Scott, who was Knighton's aunt. Marsh and Williams were jointly tried, Martin being then a fugitive. (*Id.* at p. 202 [95 L.Ed.2d at p. 182].) At the trial, Knighton testified that the crimes had occurred in the following way:

Knighton and her son were at Scott's home when Marsh and Martin arrived. They were all talking together in the living room when Marsh announced that she had come to " 'pick up something' " from Scott. (*Richardson* v. *Marsh*, *supra*, 481 U.S. 200, 202 [95 L.Ed.2d 176, 182].) Martin then pulled a gun and pointed it at Scott and Knighton, saying that " 'someone had gotten killed and [Scott] knew something about it.' " (*Ibid.*) Marsh walked to the front door and looked out the peephole. The doorbell rang and Marsh opened the door. Williams entered, carrying a gun, and asked Marsh: " 'Where's the money?' " (*Ibid.*) Martin took Scott upstairs while Williams went into the kitchen and Marsh remained with Knighton and her son. Marsh grabbed and held Knighton when she attempted to flee with her son. Williams returned from the kitchen, ordered Knighton to lie on the floor, and

went upstairs to join Martin. A few minutes later, Martin, Williams, and Scott came downstairs, and Martin handed a paper grocery bag to Marsh. Martin and Williams then took Scott, Knighton, and her son into the basement, where Martin shot each of them. Only Knighton survived. (*Ibid.* [95 L.Ed.2d at pp. 182-183].)

In addition to Knighton's testimony, the prosecution presented a confession by Williams that had been redacted to remove all references to Marsh and "indeed, to omit all indication that *anyone* other than Martin and Williams participated in the crime." (*Richardson* v. *Marsh, supra,* 481 U.S. 200, 203 [95 L.Ed.2d 176, 183], original italics.) As here relevant, the confession, in its redacted form, stated:

" '. . . I was over to my girl friend's house . . . when I received a phone call from a friend of mine named Kareem Martin. . . . He asked me if I wanted to go on a robbery with him. I said okay. . . . About 15 or 20 minutes later Kareem came by in his . . . car. I got in the car and Kareem told me he was going to stick up this crib, told me the place was a numbers house. Kareem said there would be over $5,000 or $10,000 in the place. Kareem said he would have to take them out after the robbery. Kareem had a big silver gun. He gave me a long barrelled [*sic*] .22 revolver. We then drove over to this house and parked the car across the big street near the house. The plan was that I would wait in the car in front of the house and then I would move the car down across the big street because he didn't want anybody to see the car. Okay, Kareem went up to the house and went inside. A couple of minutes later I moved the car and went up to the house. As I entered, Kareem and this older lady were in the dining room, a little boy and another younger woman were sitting on the couch in the front room. I pulled my pistol and told the younger woman and the little boy to lay on the floor. Kareem took the older lady upstairs. He had a pistol, also. I stayed downstairs with the two people on the floor. After Kareem took the lady upstairs I went upstairs and the lady was laying on the bed in the room to the left as you get up the stairs. The lady had already given us two bags full of money before we ever got upstairs. Kareem had thought she had more money and that's why we had went upstairs. Me and Kareem started searching the rooms but I didn't find any money. I came downstairs and then Kareem came down with the lady. I said, "Let's go, let's go." Kareem said no. Kareem then took the two ladies and little boy down the basement and that's when I left to go to the car. . . .' " (*Richardson* v. *Marsh, supra,* 481 U.S. 200, 203, fn. 1 [95 L.Ed.2d 176, 183].)

Williams did not testify but Marsh did. She admitted riding with Williams and Martin in Martin's car to Scott's residence, but she denied any prior

knowledge that Williams and Martin were armed or that they had planned to rob or kill anyone. (*Richardson* v. *Marsh, supra,* 481 U.S. 200, 204 [95 L.Ed.2d 176, 184].) She testified that during the drive she was unable to hear any conversation between Williams and Martin because they rode in the front, while she rode in the back, and because " 'the radio was on and the speaker was right in [her] ear.' " (*Ibid.*)

In addressing Marsh's claim that admission of Williams's confession violated her rights under the confrontation clause, the United States Supreme Court began by noting that when two defendants are jointly tried and the jury is instructed to consider the testimony of a witness against only one of the defendants, the witness is ordinarily not considered to be a witness "against" the other defendant within the meaning of the confrontation clause. (*Richardson* v. *Marsh, supra,* 481 U.S. 200, 206 [95 L.Ed.2d 176, 185].) This is because courts generally assume that jurors follow their instructions. (*Ibid.*) The court explained that its decision in *Bruton* v. *United States, supra,* 391 U.S. 123, represented "a narrow exception to this principle" that applied "when the *facially incriminating* confession of a nontestifying codefendant is introduced at [a] joint trial." (*Richardson* v. *Marsh, supra,* 481 U.S. 200, 207 [95 L.Ed.2d 176, 185-186], italics added.)

The court concluded that Williams's confession fell "outside the narrow exception we have created" because, unlike the confession at issue in *Bruton* v. *United States, supra,* 391 U.S. 123, it "was not incriminating on its face, and became so only when linked with evidence introduced later at trial (the defendant's own testimony)." (*Richardson* v. *Marsh, supra,* 481 U.S. 200, 208 [95 L.Ed.2d 176, 186].) The court continued:

"Where the necessity of such linkage is involved, it is a less valid generalization that the jury will not likely obey the instruction to disregard the evidence. Specific testimony that 'the defendant helped me commit the crime' is more vivid than inferential incrimination, and hence more difficult to thrust out of mind. Moreover, with regard to such an explicit statement the only issue is, plain and simply, whether the jury can possibly be expected to forget it in assessing the defendant's guilt; whereas with regard to inferential incrimination the judge's instruction may well be successful in dissuading the jury from entering onto the path of inference in the first place, so that there is no incrimination to forget." (*Richardson* v. *Marsh, supra,* 481 U.S. 200, 208 [95 L.Ed.2d 176, 186].)

The *Richardson* court also noted certain "practical effects" of extending the holding of *Bruton* v. *United States, supra,* 391 U.S. 123, to confessions that incriminate nondeclarant defendants only when considered in the context of other evidence introduced at the joint trial.

First, whereas facial incrimination is usually curable by redaction that eliminates references to coparticipants, there may be no way to effectively redact a confession that incriminates nondeclarants only when linked to other evidence. (*Richardson* v. *Marsh, supra*, 481 U.S. 200, 209 [95 L.Ed.2d 176, 186-187].)

Second, when ruling on a motion to exclude a codefendant's confession (or to sever the trials of jointly charged defendants), a trial judge's task will be significantly more difficult if the trial judge is required to consider not only the confession itself but also the other evidence that has been or is likely to be presented at a joint trial. (*Richardson* v. *Marsh, supra*, 481 U.S. 200, 209 [95 L.Ed.2d 176, 187].)

Third, extending the rule of *Bruton* v. *United States, supra*, 391 U.S. 123, to confessions that are not facially incriminating would result in fewer joint trials, thereby requiring "that prosecutors bring separate proceedings, presenting the same evidence again and again, requiring victims and witnesses to repeat the inconvenience (and sometimes trauma) of testifying, and randomly favoring the last-tried defendants who have the advantage of knowing the prosecution's case beforehand." (*Richardson* v. *Marsh, supra*, 481 U.S. 200, 210 [95 L.Ed.2d 176, 187].) The court further observed that "joint trials generally serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts." (*Ibid.*, fn. omitted.)

In conclusion, the high court observed: "The rule that juries are presumed to follow their instructions is a pragmatic one, rooted less in the absolute certitude that the presumption is true than in the belief that it represents a reasonable practical accommodation of the interests of the state and the defendant in the criminal justice process." (*Richardson* v. *Marsh, supra*, 481 U.S. 200, 211 [95 L.Ed.2d 176, 188].) The court recognized that when a nontestifying codefendant's confession is facially incriminating, this accommodation is "inadequate," but it declined to extend this reasoning to require exclusion of a nontestifying codefendant's confession "when, as here, the confession is redacted to eliminate not only the defendant's name, but any reference to his or her existence." (*Ibid.*) In a footnote, the court stated: "We express no opinion on the admissibility of a confession in which the defendant's name has been replaced with a symbol or neutral pronoun." (*Id.* at p. 211, fn. 5 [95 L.Ed.2d at p. 188].)

Following *Richardson* v. *Marsh, supra*, 481 U.S. 200, many federal and state courts have addressed the issue reserved by the high court: whether redacting a nontestifying codefendant's confession to replace references to the defendant's name with a "symbol or neutral pronoun" avoids violation of

a defendant's rights under the confrontation clause. The result has been a split in authority, with one group taking the position that such redaction is always or almost always sufficient (e.g., *U.S.* v. *Strickland* (7th Cir. 1991) 935 F.2d 822, 826; *U.S.* v. *Vogt* (4th Cir. 1990) 910 F.2d 1184, 1192; *State* v. *Craney* (Me. 1995) 662 A.2d 899, 903), and another group expressing the view that whether such redaction is sufficient must be determined on a case-by-case basis (e.g., *U.S.* v. *Van Hemelryck* (11th Cir. 1991) 945 F.2d 1493, 1502-1503; *U.S.* v. *Hoac* (9th Cir. 1993) 990 F.2d 1099, 1107; *U.S.* v. *Long* (8th Cir. 1990) 900 F.2d 1270, 1280).

The question before this court is one of federal constitutional law. ▮ To the extent that our decision in *People* v. *Aranda, supra*, 63 Cal.2d 518, constitutes a rule governing the admissibility of evidence, and to the extent this rule of evidence requires the exclusion of relevant evidence that need not be excluded under federal constitutional law, it was abrogated in 1982 by the "truth-in-evidence" provision of Proposition 8 (Cal. Const., art. I, § 28, subd. (d)).[3] (See *People* v. *Mitcham* (1992) 1 Cal.4th 1027, 1045, fn. 6 [5 Cal.Rptr.2d 230, 824 P.2d 1277]; *People* v. *Walkkein* (1993) 14 Cal.App.4th 1401, 1407 [18 Cal.Rptr.2d 383].)

Whether instructing the jury to disregard a nontestifying codefendant's confession in determining a defendant's guilt adequately protects the defendant's Sixth Amendment right of confrontation depends upon whether the jurors can reasonably be expected to obey the instruction. (See *Richardson* v. *Marsh, supra*, 481 U.S. 200, 206-208 [95 L.Ed.2d 176, 184-186]; *Bruton* v. *United States, supra*, 391 U.S. 123, 135-136 [20 L.Ed.2d 476, 485].) In turn, the jurors' ability to obey the instructions depends upon how directly and how forcefully the codefendant's confession incriminates the nondeclarant defendant. (*Richardson* v. *Marsh, supra*, at p. 208 [95 L.Ed.2d at p. 186].)

Substituting a pronoun or other neutral term for the defendant's name will make the confession less directly incriminating, but it does not invariably provide sufficient assurance that the average reasonable juror will be able to obey an instruction to disregard the confession when considering the guilt of the nondeclarant. A confession redacted with neutral pronouns may still prove impossible to "thrust out of mind" (*Richardson* v. *Marsh, supra*, 481

---

[3]That constitutional provision states: "Except as provided by statute hereafter enacted by a two-thirds vote of the membership in each house of the Legislature, relevant evidence shall not be excluded in any criminal proceeding, including pretrial and post conviction motions and hearings, or in any trial or hearing of a juvenile for a criminal offense, whether heard in juvenile or adult court. Nothing in this section shall affect any existing statutory rule of evidence relating to privilege or hearsay, or Evidence Code, Sections 352, 782 or 1103. Nothing in this section shall affect any existing statutory or constitutional right of the press." (Cal. Const., art. I, § 28, subd. (d).)

U.S. 200, 208 [95 L.Ed.2d 176, 186]) if, for example, it contains references to distinctive clothing, mannerisms, place of residence, or other information that readily and unmistakably identifies the person referred to as the non-declarant defendant. This point is illustrated by the facts of *People* v. *Terry* (1970) 2 Cal.3d 362 [85 Cal.Rptr. 409, 466 P.2d 961].[4]

In *Terry*, two defendants, Harold Terry and Juanelda Allen, were jointly charged with two murders. At their joint trial, the prosecution introduced a confession by Allen that implicated Terry. The confession was redacted by substituting the word "deleted" for the name "Harold." But, as this court remarked, "[t]he result was somewhat ridiculous" and "it must have been obvious to everyone that 'deleted' and Terry were one and the same." (*People* v. *Terry, supra,* 2 Cal.3d 362, 384-385.) The identity of "deleted" was obvious because the confession indicated that "deleted" was a male African-American who lived with Allen, while the jury could see that Terry was a male African-American and it knew, from other evidence introduced at the trial, that Terry and Allen had been living together during the events described in Allen's confession. (*Id.* at p. 385.) Thus, "[t]he jury was bound to know that 'deleted' must have been Terry" and Allen's confession "clearly implicated Terry and accused him of both . . . homicides." (*Ibid.*) We concluded that the trial court had erred in allowing the redacted confession to be admitted in evidence, although we also concluded that Terry had not been prejudiced by the error. (*Id.* at pp. 385-389.)

In such cases, where any reasonable juror must inevitably perceive that the defendant on trial is the person designated by pronoun or neutral term in the codefendant's confession, an assumption that a limiting instruction could "be successful in dissuading the jury from entering onto the path of inference" (*Richardson* v. *Marsh, supra,* 481 U.S. 200, 208 [95 L.Ed.2d 176, 186]) would be little short of absurd. On the other hand, there are instances in which replacing a nondeclarant defendant's name with a symbol or neutral pronoun will be effective in protecting the nondeclarant's rights under the confrontation clause. For example, a confession that is redacted to substitute pronouns or similar neutral and nonidentifying terms for the name of a codefendant will be sufficient if the codefendant was just one of a large group of individuals any one of whom could equally well have been the coparticipant mentioned in the confession. (See, e.g., *U.S.* v. *Chrismon* (7th Cir. 1992) 965 F.2d 1465, 1472-1473; see also *U.S.* v. *Hoac, supra,* 990 F.2d 1099, 1107.)

Although this case-by-case approach requires consideration of evidence other than the confession itself, we are persuaded that the "practical effects"

---

[4]For additional illustrations, see *U.S.* v. *Foree* (11th Cir. 1995) 43 F.3d 1572, 1578, footnote 9.

mentioned by the high court in *Richardson* v. *Marsh, supra,* 481 U.S. 200, present no insurmountable problems in this context.

The *Richardson* court was concerned, first, that adopting a "contextual linkage" approach, which requires consideration of evidence extrinsic to the confession in determining whether it powerfully incriminates a nondeclarant defendant, might make effective redaction impossible, thereby eliminating redaction as one possible solution to the confrontation clause problem. (*Richardson* v. *Marsh, supra,* 481 U.S. 200, 209 [95 L.Ed.2d 176, 186-187].) But *Richardson* itself has ensured that redaction will continue to be a viable solution to the confrontation clause problem in many if not most codefendant confession cases. So long as the confession is redacted to eliminate all references not only to the nondeclarant's name, but also to the non-declarant's very existence, it may, under *Richardson,* be introduced at a joint trial, with an appropriate limiting instruction, without violation of the non-declarant's confrontation rights.

Moreover, even in those instances in which it is not feasible to eliminate all of the confession's references to the nondeclarant's existence, redaction will continue to be a viable solution in a substantial number of cases. As we have seen, redaction that replaces the nondeclarant's name with a pronoun or similar neutral and nonidentifying term will adequately safeguard the non-declarant's confrontation rights unless the average juror, viewing the confession in light of the other evidence introduced at trial, could not avoid drawing the inference that the nondeclarant is the person so designated in the confession and the confession is "powerfully incriminating" on the issue of the nondeclarant's guilt.

The high court was concerned, second, that requiring consideration of evidence extrinsic to the confession would make it more difficult, or even impossible, for trial courts to rule on severance and admissibility questions in advance of trial. (*Richardson* v. *Marsh, supra,* 481 U.S. 200, 209 [95 L.Ed.2d 176, 187].) But the trial court can preview the evidence to be presented at trial by reading preliminary hearing transcripts and other materials submitted by the parties and by considering the parties' offers of proof. Rulings made in advance of trial may be reconsidered at trial, before admission of the confession in question, should the evidence at trial prove to be materially different than the parties and the court anticipated.

The court was concerned, third, that if the confrontation clause problem could not be resolved by redacting the confession, there would be significantly fewer joint trials, resulting in a less efficient use of judicial and prosecutorial resources, additional inconvenience and even trauma to witnesses, and the possibility of inconsistent verdicts. (*Richardson* v. *Marsh,*

*supra*, 481 U.S. 200, 210 [95 L.Ed.2d 176, 187].) As we have explained, using a "contextual implication" approach when a confession is redacted with pronouns or similar neutral terms will not eliminate or even greatly reduce the utility of redaction as a solution to the confrontation clause problem. Moreover, when effective redaction is impossible, or not acceptable to the prosecution, holding separate trials for the declarant and nondeclarant defendants is not the only means of protecting the nondeclarant from the prejudicial effect of a codefendant's confession. An alternative to separate trials that this court has expressly approved is a joint trial with separate juries for each defendant. When evidence of one defendant's confession is received, the jury for the other defendant is removed from the courtroom, and the cases are argued to each jury in the other's absence. (See *People* v. *Cummings* (1993) 4 Cal.4th 1233, 1287 [18 Cal.Rptr.2d 796, 850 P.2d 1]; *People* v. *Harris* (1989) 47 Cal.3d 1047, 1070-1076 [255 Cal.Rptr. 352, 767 P.2d 619]; see also Note, *Richardson* v. *Marsh: Codefendant Confessions and the Demise of Confrontation* (1988) 101 Harv. L.Rev. 1876, 1890-1894.) This approach conserves judicial and prosecutorial resources, and it avoids the inconvenience and trauma to witnesses that result when they must repeat their testimony in separate proceedings.[5]

We conclude that when the prosecution proposes to redact one defendant's confession to substitute pronouns or similar neutral terms for the name of a codefendant, the "contextual implication" approach provides a practical accommodation of the competing interests at stake—the nondeclarant's constitutionally protected rights under the confrontation clause and the interests of the state in the fair and efficient administration of the criminal justice system. We hold, therefore, that editing a nontestifying codefendant's extrajudicial statement to substitute pronouns or similar neutral terms for the defendant's name will not invariably be sufficient to avoid violation of the defendant's Sixth Amendment confrontation rights. Rather, the sufficiency of this form of editing must be determined on a case-by-case basis in light of the statement as a whole and the other evidence presented at the trial. (Cf. *People* v. *Calderon* (1994) 9 Cal.4th 69, 78-79 [36 Cal.Rptr.2d 333, 885 P.2d 83] [holding that trial court should decide, on a case-by-case

---

[5]Another alternative that has been suggested, but apparently never used in this state, is a joint but bifurcated trial in which the jury first determines the guilt of the nondeclarant defendant, then receives evidence of the nontestifying codefendant's extrajudicial confession, and finally proceeds to determine the guilt or innocence of that defendant. (See Dickett, *Sixth Amendment—Limiting the Scope of Bruton* (1988) 78 J. Crim L. & Criminology 984, 1010 [suggesting this alternative procedure].) We note, however, that federal appellate courts have reversed convictions of defendants whose guilt has been determined in a bifurcated trial, concluding that it may be practically impossible for a jury to determine one defendant's guilt without impermissibly prejudging the guilt of another defendant jointly tried. (See, e.g., *United States* v. *McIver* (11th Cir. 1982) 688 F.2d 726, 729-730 [68 A.L.R.Fed. 911].)

basis, whether bifurcated trial of prior conviction allegation is necessary to avoid "substantial risk of undue prejudice to the defendant"].)[6]

## III

Because the Court of Appeal correctly articulated the governing law, it remains only to determine whether the Court of Appeal correctly applied that law to the facts of this case. ■ Preliminarily, we must consider the People's argument that defendant Moord has waived any error in the redaction of codefendant Fletcher's confession by failing at trial to object to the form of redaction approved by the trial court.

We agree with the Court of Appeal that defendant Moord has not waived this contention. As the Court of Appeal explained:

"The People argue that at the second trial Moord did not seek redaction of Fletcher's statement and cannot, therefore, raise the issue on appeal. Moord sought redaction of the statement at the first trial. When the *Aranda* issue was raised at the second trial, the court incorporated the arguments previously made. There was no waiver."

■ We also agree with the Court of Appeal that admission of the redacted statement violated Moord's Sixth Amendment right of confrontation. Although the redacted statement did not mention Moord by name, it informed the jury that Fletcher and another man were present at the scene of the crime (a fact also established by the testimony of passengers in the victim's car), that "they" (that is, Fletcher and the other man) were "using some kind of ruse to get people to stop," and "that they were doing that so when people would stop that they could rob them, take their money." Because Shirley Forest's testimony placed Moord in Fletcher's company just moments after the fatal shooting,[7] reasonable jurors could not avoid drawing the inference that Moord was the unnamed person mentioned in Fletcher's statement. The statement was strongly incriminating because it attributed to

---

[6]As we have already noted, the issue we decide here is one of federal constitutional law. From this fact it necessarily follows that our holding may not be the last word, because the issue may come before the United States Supreme Court, whose decisions on questions of federal constitutional law are binding on all state courts under the supremacy clause of the United States Constitution. (See *Oregon* v. *Hass* (1975) 420 U.S. 714, 719 [43 L.Ed.2d 570, 575-576, 95 S.Ct. 1215]; *Sims* v. *Georgia* (1967) 385 U.S. 538, 544 [17 L.Ed.2d 593, 598, 87 S.Ct. 639]; *People* v. *Diaz* (1992) 3 Cal.4th 495, 569 [11 Cal.Rptr.2d 353, 834 P.2d 1171].)

[7]Forest testified that she telephoned for a cab approximately 10 minutes after Moord and Fletcher first knocked at her door and that the cab arrived 20 to 30 minutes later. The cab driver testified that he arrived at 3:12 a.m., and that this was 20 minutes after he had been

Moord as well as Fletcher an intent to use a ruse to induce motorists to stop near the stranded taxi so that Moord and Fletcher could rob them. But for this statement, the jury might have concluded that Moord's only intent was to take the taxi. Because the taxi in fact had a mechanical problem causing it to stall, Moord may have thought that Fletcher was merely seeking assistance in getting the taxi started and may not have expected Fletcher to use force, an inference supported by the witnesses' testimony that one of the two men said "Oh, no," shortly before or during the firing of the fatal shot. Because Fletcher's statement powerfully incriminated Moord even after redaction, its admission in evidence over Moord's objection violated his Sixth Amendment right of confrontation.

 Finally, we agree with the Court of Appeal's conclusion that the error requires reversal of Moord's convictions for murder and attempted robbery. In the Court of Appeal's words:

"There is little doubt Fletcher and Moord were the two men who approached Maria[ Estrada]'s car on the on-ramp. The form of the People's case was that Fletcher was the shooter and Moord was an aider and abettor. While the intent of the shooter to commit a robbery might be apparent from the circumstances of the crime alone, we think the state of mind of any alleged aider and abettor more problematic. There is no evidence concerning Fletcher and Moord's relationship before the crime that illuminates Moord's state of mind at the time of the crime. . . . [¶] The evidence simply does not exclude the possibility Moord had no criminal intent at the time Maria was killed. Nor does it exclude the possibility that even if Moord intended to aid and abet Fletcher in some criminal activity [such as auto burglary, auto theft, or joyriding], an attempted robbery was not a natural and probable consequence of the crime in which Moord intended to participate. [¶] Fletcher's

---

dispatched. Thus, according to this testimony, Moord and Fletcher reached Forest's apartment no later than 2:42 a.m.

The approximate time of the shooting is determined by inference from the testimony of the victim's son Jesus Estrada, her brother Antonio Huizar, and Odie Lindsay, an officer with the community college district. After the shooting, Jesus Estrada jumped into the front seat, removed his mother's foot from the accelerator, and applied the brake, stopping the car. The shooting occurred at the southbound on-ramp from Market Street to interstate 15, and the Estradas' car came to rest at the next off-ramp, leading to Imperial Avenue, a distance of approximately two city blocks. After the car stopped, Jesus Estrada and Antonio Huizar got out and flagged down Lindsay. Apparently no great time passed between the stopping of the car and the flagging down of Lindsay, because Jesus Estrada described the event this way: "We went—my grandma, she went running to get some help, and I went, too, and we saw a school police and my—I couldn't—I couldn't catch him, and then [Antonio Huizar] came and he went running and he stopped—he stopped him . . . ." Lindsay looked in the Estradas' car and then radioed for assistance. Lindsay testified that by reviewing the transcript of the dispatcher tape he had determined that his call had been made at 2:47 a.m. Thus, one may reasonably infer from the evidence that the shooting occurred no earlier than 2:30 a.m.

statements to Kramer suggested very strongly that it was the intent of both Fletcher and Moord to commit a robbery."

The prejudicial effect of the error was compounded by the prosecutor's argument to the jury, during which he urged the jury to consider Fletcher's extrajudicial statement in determining not only his guilt but Moord's as well. Specifically, the prosecutor argued that Fletcher's extrajudicial statement established the criminal intent of *both* participants: "Remember, we're talking about the intent of the defendants. What were they thinking? What were they trying to do? And the answer is just what Mr. Fletcher told Roland Kramer, they were using [the taxicab] as a ruse to get people to stop so they could rob them."

As Moord argues in his brief to this court, this argument "demonstrates that not even the prosecutor—a trained attorney with sufficient experience to be assigned to homicide cases—could limit the statement to Fletcher and ignore it when arguing [Moord's] guilt. If the legally trained prosecutor was unable to limit the statement to Fletcher, we safely can infer that this was true of the lay jurors as well." Therefore, we agree with the Court of Appeal that the error prejudiced Moord.

The Court of Appeal's judgment is affirmed.

George, C. J., Mosk, J., Baxter, J., Werdegar, J., Chin, J., and Lucas, J.,* concurred.

On July 12, 1996, the opinion was modified to read as printed above.

---

*Retired Chief Justice of the Supreme Court, assigned by the Acting Chief Justice pursuant to article VI, section 6 of the California Constitution.