Filed 11/6/14  P. v. Davis CA3

## NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# THIRD APPELLATE DISTRICT

## (Tehama)

----

| | |
|---|---|
| THE PEOPLE, | C071689 |
| Plaintiff and Respondent, | (Super. Ct. No. NCR82824) |
| v. | ORDER DENYING PETITION FOR REHEARING AND MODIFYING OPINION |
| JOSEPH VICTOR DAVIS, | |
| Defendant and Appellant. | [NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the nonpublished opinion filed herein on October 16, 2014, be modified as follows:

At page 12, delete footnote 6 of our opinion, which reads:

**6** Defendant forfeited his right to claim on appeal that Daniel's testimony violated his federal right to due process by failing to make that objection in the trial court.  (*People v. Millwee* (1998) 18 Cal.4th 96, 128-129.)

and replace it with a new footnote 6 as follows:

1

**6** Defendant also claims a violation of due process. We must determine whether the erroneous admission of evidence rendered defendant's trial fundamentally unfair (*People v. Partida* (2005) 37 Cal.4th 428, 439) and, if constitutional error occurred, whether it is clear beyond a reasonable doubt that the erroneously admitted evidence did not contribute to the verdict (*People v. Albarran* (2007) 149 Cal.App.4th 214, 229 [*Chapman* standard applies to federal constitutional errors (*Chapman v. California* (1967) 386 U.S. 18 [17 L.Ed.2d 705])]). Absent fundamental unfairness, error in admitting evidence is subject to the *Watson* test. (*People v. Partida*, *supra*, 37 Cal.4th at p. 439, citing *People v. Watson, supra,* 46 Cal.2d at p. 836.)

In light of Daniel and Ortega's testimony and other evidence identifying defendant as the would-be buyer who held them at gunpoint, we conclude the hearsay statement was not so prejudicial as to necessarily render defendant's trial unfair. (*People v. Hunt* (2011) 196 Cal.App.4th 811, 817 [" 'Only if there are *no* permissible inferences the jury may draw from the evidence can its admission violate due process. Even then, the evidence must "be of such quality as necessarily prevents a fair trial." ' "].) Moreover, given the substantial evidence supporting defendant's conviction discussed in this part of our opinion, any error in the admission of the hearsay statement was harmless whether analyzed under *Watson* or *Chapman*.

Appellant's petition for rehearing is denied. There is no change in judgment.


BY THE COURT:


_____HULL_____, Acting P. J.


_____BUTZ_____, J.


_____MURRAY_____, J.


2

Filed 10/16/14 (unmodified version)

**NOT TO BE PUBLISHED**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## THIRD APPELLATE DISTRICT

**(Tehama)**

----

| | |
|---|---|
| THE PEOPLE, | C071689 |
| Plaintiff and Respondent, | (Super. Ct. No. NCR82824) |
| v. | |
| JOSEPH VICTOR DAVIS, | |
| Defendant and Appellant. | |

A jury found defendant Joseph Victor Davis guilty of three counts of assault with a semiautomatic firearm (Pen. Code, § 245, subd. (b)),[1] three counts of carjacking (§ 215, subd. (a)), being a felon in possession of a firearm (§ 12021, subd. (a)(1)), and possession of ammunition (§ 12316, subd. (b)(1)). The jury also found true numerous sentencing enhancement allegations. The trial court sentenced defendant to an aggregate term of 26 years four months in state prison.

---

[1] Undesignated statutory references are to the Penal Code in effect at the time of defendant's October 27, 2011 crimes.

On appeal, defendant claims the trial court wrongly admitted hearsay testimony that prejudiced his ability to receive a fair trial. Defendant also claims the trial court erred in failing to stay the sentence on his convictions for carjacking because, he contends, the carjacking and the assault arose from the same act or course of conduct as to each of the victims. Finally, defendant contends his sentence for possessing ammunition should be stayed because he cannot be punished for both possessing a gun and possessing the ammunition inside that gun.

We conclude the trial court erred in admitting hearsay testimony, but also conclude defendant would not have had a more favorable verdict had the testimony been excluded. We further conclude the trial court properly refused to stay the sentences on defendant's convictions for carjacking, but agree with the People's concession that defendant's conviction for possessing ammunition should be stayed. We shall modify the judgment accordingly.

### FACTUAL AND PROCEDURAL BACKGROUND

*The Offenses*

On October 27, 2011, around 10:00 p.m., five people went out to sell a half-pound of marijuana in a deal arranged by Jesse James King. Pursuant to King's arrangement, King and his girlfriend drove one car; they were followed in another car by Richard Endres, his son, Daniel Endres, and Daniel's girlfriend, Christina Ortega.[2] The plan was to follow King to a house in Red Bluff, where they would sell the marijuana to someone for $1,100. After stopping at a convenience store, where King made a phone call, the two cars drove through an industrial area and turned onto a road that dead-ended at a canal.

---

[2] Due to sharing the same surname, we shall refer to Richard and Daniel Endres by their first names. No disrespect is intended.

The two cars turned onto the dead-end road; a red car was already parked at the end of the road. Defendant and two other men were inside the red car. Richard parked his car in front of the red car and King parked behind it. Richard and Daniel got out of their car and walked toward the trunk where they met the three men who were waiting for them. Ortega joined them minutes later.

King, Richard, Daniel, and Ortega were now all standing in a circle near the front fender of defendant's red car; everyone shook hands and greeted each other (no names were given). Defendant stood to Ortega's right and Richard to her left, both about three feet away from her. Daniel stood approximately seven feet from defendant, facing him; Richard stood next to Daniel.

At this point, Daniel and Richard were supposed to get in the car with defendant and complete the sale of marijuana but defendant pulled out a gun, pointed it at Daniel and Richard and said, "get the fuck back." Daniel and Richard backed away from their car, but Ortega jumped inside the car and tried to get the keys from the ignition. Inside Richard's car, Ortega fought with the men who were with defendant; defendant then opened the car door, aimed the gun at Ortega and ordered her out of the car. Ortega argued with defendant and he hit her in the face with the gun.[3] Ortega grabbed her purse and got out of the car. Defendant and one of the other men then left with Richard's car; Richard, Daniel, and Ortega walked half a mile and called the police.

Deputy Sheriff Ronald Leaf responded to the call. Ortega described the assailant to Leaf as a "white male adult, early 20's, 5 foot 8 inches tall, 150 to 170 pounds, short dark-colored hair, and some sort of goatee." Daniel described him as "a white male who may have had a small goatee." Ortega also told Leaf the gun was a "dark-colored

---

[3] Around this time, King drove away in his car.

3

handgun," and that the assailant had hit her in the face with it. Leaf noticed a red mark on Ortega's face but did not take a picture.

Deputy Leaf showed Richard, Daniel, and Ortega two "six-pack" photographic lineups. Leaf admonished each of them that the person they were looking for may not be in the lineup. Richard, Daniel, and Ortega each identified defendant as their assailant and each signed the photographic lineup confirming their identification. Leaf soon found the stolen car, approximately five miles from where the crimes occurred.

The following day, around 4:30 p.m., Deputy Sheriff Christopher Benson saw defendant driving a red 1991 Toyota. Benson stopped defendant, drew his firearm, and ordered defendant to get out of the car and put his hands on the roof. Defendant ignored Benson and began dialing a number on his cell phone. Benson repeated the order, but defendant continued to ignore him; defendant was able to complete his call and tell someone that he was being arrested. Benson and his partner, Deputy Thompson, were ultimately able to remove defendant from the car and arrest him.

Pursuant to the arrest, Sheriff's Detective Chad Parker inventoried the red Toyota. Inside the car, under the passenger's seat, Detective Parker found a dark-colored handgun. The gun had a magazine in it and was loaded with two rounds of ammunition. Parker also found 10 rounds of .357 handgun ammunition inside the trunk of the Toyota. This ammunition, however, did not fit in the handgun that was under the passenger seat.

Defendant was subsequently charged with three counts of assault with a semiautomatic firearm (counts I-III—§ 245, subd. (b)), three counts of carjacking (counts IV-VI—§ 215, subd. (a)), possession of a firearm by a felon (count VII—§ 12021, subd. (a)(1)), and possession of ammunition (count VIII—§ 12316, subd. (b)(1)). The People further alleged defendant used a firearm during the commission of the crimes charged in counts I through III (§ 12022.5, subd. (a)) and counts IV through VI (§ 12022.53, subd. (b)), and previously served a term in prison (§ 667.5, subd. (b)). Defendant pleaded not

4

guilty to the charges, but admitted previously serving a term in prison. Jury trial on the charges and remaining allegations began on June 13, 2012.

*Trial*

1. <u>Evidence</u>.

At trial, Daniel and Ortega affirmatively identified defendant as the man who hit Ortega with a gun and stole their car on the night of October 27, 2011. During her testimony, Ortega described distinguishing features of her assailant, which she noticed that night: "This piece right here looked like facial hair and some writing. Tattoo work right here on his neck." Daniel testified that he noticed the man who held them at gunpoint that night had a tattoo "underneath [his] lip," on his chin.

Daniel and Richard both testified that when they identified defendant in the photographic lineup, neither of them was completely certain he was their assailant. And, while Daniel was able to positively identify defendant at trial as their assailant, Richard still was not.

Defendant presented a witness of his own, Lechelle Caughey, who testified that the red Toyota defendant was driving on the day of his arrest was her car, not his. She said the ammunition in the trunk was hers as well. According to Caughey, on the night these crimes were committed, she was working a night shift in Red Bluff and the car was with her. She further explained that she had loaned the car to defendant only a couple of hours before he was arrested. Caughey testified that she did not know there was a gun in the car, but explained the window had been broken for months and she regularly left the car parked in an alley and unlocked. Thus, defendant argued, he was simply a victim of circumstances.

Defendant also attempted to discredit the identifications made by Richard, Daniel, and Ortega. He argued that Ortega's description of her assailant at trial was more detailed than the one she gave Deputy Leaf immediately following the carjacking and

5

assault.  This, he argued, was incredible.  Defendant also argued that it defied common sense that Daniel could not be certain defendant was their assailant on the night the crimes were committed but could positively identify him eight months later at trial. Defendant told the jury these inconsistencies with their prior statements to law enforcement were likely because they wanted to "pin something on [defendant] for some reason."

Defendant also said Richard, Daniel, and Ortega's testimony could not be trusted simply because they were liars and drug dealers.  He noted that each of them initially lied to the police the night they reported the crimes, telling the police they were out to get tattoos; they only admitted they were out to sell marijuana after the stolen car was found. Defendant also argued their testimony regarding what exactly happened that night was inconsistent with their prior statements to law enforcement, thus making their testimony unreliable.  To support his argument, defendant noted there were inconsistencies regarding who shook hands, who got out of the car, and whether a car window was broken.[4]

Ortega had additional credibility issues, according to defendant.  Defendant argued her testimony was unreliable because she claimed to have a medical condition that could result in internal bleeding if she were injured, yet when defendant purportedly hit her in the face with a gun, she was left with only a red mark.  According to defendant, it was also unreasonable to believe Ortega would engage in a physical altercation with three unknown men, for a car that was not even hers, if she indeed did have such a serious medical condition.

---

[4] On cross-examination, Deputy Leaf testified that when he spoke to Ortega in the hospital following the assault, she told him she did not get out of the car, she never mentioned fighting with the two other men, and she never mentioned anyone shaking hands.  She also did not tell him that her assailant had tattoos.

6

2.  Hearsay objections.

During trial, the People asked Daniel, "Who were you going to sell the marijuana to?"  Defendant objected on the grounds of hearsay and lack of foundation.  The court overruled the hearsay objection.  Defendant then objected for lack of foundation.  The court invited counsel to approach the bench and explain the objection.  At the bench, defense counsel argued the witness might say "he was going to sell the marijuana to 'Famous.'  Counsel objected on the basis of foundation, hearsay, and overwhelming prejudice because the jury could see a tattoo, across [defendant's] neck, which read, 'FAMOUS.' "[5]

Following the bench conference, Daniel answered the question:  "A gentleman by the name of Famous."  The People then asked Daniel whether he knew the person to whom he was going to sell the marijuana.  Daniel said he did not, that the deal was arranged by someone else, and King was going to lead them all to the buyer's house.

At the conclusion of Daniel's testimony, the trial court asked defense counsel whether she wanted a hearsay admonition given; counsel responded affirmatively.  The court then gave the following admonition to the jury:  "A while ago there was a statement from this witness— . . .  [¶]  There was a statement from this witness that he was going to meet with Famous.  It has become clear from the testimony that followed that he knew that only because somebody told him that that is not here today.  That is a definition of hearsay, repeating what someone else said outside of the court, repeating it here to prove the truth of the matter.  [¶]  So I am instructing you that that particular statement, that he was going to meet Famous, may be considered by you not for the truth, because that is just what he was told, but only to demonstrate his state of mind, that he thought he was

---

[5]  The bench conference was not reported, but summarized after trial in a settled statement.

7

going down to meet somebody that night.  [¶]  There is a distinction there.  His statement was not proved, that anybody by the name of Famous was there.  It only proves that that is what he thought and this why he came down the road."

The People also asked Ortega, "Did you—who were you coming to sell marijuana to?"  Defense counsel objected to the question, again arguing lack of foundation and hearsay.  This time, the trial court sustained the objection and directed the People to lay a foundation before asking the question.  Ortega then testified that she did not personally know the person to whom they were selling the marijuana, she only knew that he was a friend of King's.

Though no additional hearsay objection was sustained, the court again admonished the jury regarding hearsay:  "Once again there are expectations [*sic*] to the hearsay rule that make common sense; that is, people don't just do things.  They usually have some reason for doing them.  Sometimes the reasons they have aren't even true; they just think they [are] true, but that still motivates them to take the next step.  [¶]  There may be hearsay objections here.  When I do rule that something is state of mind, what that means is the testimony doesn't prove anything expect [*sic*] what the person was thinking, what this witness was thinking that motivated them to do something.  And we'll make that more clear if we have to."

3.  <u>Deliberations, verdict, judgment, and sentence</u>.

During their deliberations the jury had several requests for the court, including a request for the court reporter to read back testimony from Richard, Daniel, and Ortega describing their assailant, as well as Deputy Leaf's testimony.  The court reporter read back the relevant portions of the transcript, which included Daniel's testimony that they were going to sell marijuana to a man named "Famous."  Accordingly, the court reporter also read the trial court's admonition that this testimony was not to be used to prove they were meeting a man named Famous, but only to show their state of mind—why they

8

were there that night. The testimony of Deputy Leaf and Ortega was read to the jury off the record.

The jury subsequently returned a verdict of guilty on all counts and found true the sentencing enhancement allegations. The trial court then sentenced defendant to an aggregate term of 26 years four months in state prison: nine years for the assault on Richard (count I), plus a 10-year enhancement for the personal use of a gun; an aggregate, concurrent term of 19 years for the assaults on Ortega (count II) and Daniel (count III), including the gun use enhancement; an aggregate, consecutive term of five years for the carjacking against Richard (count IV), including the gun use enhancement; and two aggregate, concurrent terms of five years for the carjacking against Ortega (count V) and Daniel (count VI), also including the gun use enhancement; two concurrent terms of eight months each for possession of a firearm (count VII) and possession of ammunition (count VIII); and an additional one year for the prior prison term. Defendant was ordered to pay various fines and fees and awarded 525 days of custody credits. (§ 4019.)

## DISCUSSION

### I. Hearsay Evidence

Defendant contends the trial court erred in permitting Daniel to testify that he was going to meet a man named Famous, and that Famous would buy Daniel's marijuana. Such testimony, defendant contends, was inadmissible hearsay because Daniel did not know who Famous was but rather, the deal had been arranged by a third party, who told Daniel that Famous would be the buyer.

Defendant further contends Daniel's testimony was not relevant for a nonhearsay purpose because, contrary to the trial court's ruling, whether the buyer's name "was Famous, In-Famous, Fred, or Wilma" had no bearing on Daniel's state of mind. That

9

Daniel and his cohorts were going to sell marijuana to someone was not in dispute.  The only fact in dispute was whether the person they met was defendant.  Thus, this particular testimony was relevant only to identify defendant as the would-be buyer.

Finally, defendant contends he was prejudiced by the trial court's error because the witnesses who identified defendant were unreliable, the handgun found in defendant's car proved nothing, and "there can be no confidence the jury heeded the court's admonition" not to consider Daniel's statement for the purpose of identification because the jury could see the word "FAMOUS" tattooed on defendant's neck.

We agree the trial court erred in admitting Daniel's testimony in this regard because the evidence was hearsay and was not relevant for a nonhearsay purpose; however, we find defendant was not prejudiced by the error because there was sufficient other evidence identifying him as the would-be buyer of the marijuana.  We also are not persuaded that Daniel's testimony—and the tattoo visible on defendant's neck—were so overpowering they precluded the jury from following the court's repeated admonitions.

The application of ordinary rules of evidence does not implicate the federal Constitution, and thus we review error in admitting hearsay under the standard set forth in *People v. Watson* (1956) 46 Cal.2d 818.  (*People v. Harris* (2005) 37 Cal.4th 310, 336.)  We examine the entire cause to determine whether it is reasonably probable that a result more favorable to defendant would have been reached in the absence of the error.  (*Watson*, at p. 836; see also Evid. Code, § 353, subd. (b) [a verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous admission of evidence unless the error resulted in a miscarriage of justice].)

On the night of the crime, Daniel and Ortega described to law enforcement the man who held them at gunpoint and stole their car.  Their descriptions were general, but consistent.  That same night, Richard, Daniel, and Ortega each separately identified defendant in a photographic lineup as the would-be buyer who held them at gunpoint and

10

stole their car. Richard and Daniel were not certain defendant was their assailant, but Ortega was unequivocal. At trial, Daniel and Ortega again identified defendant as their assailant. Additionally, when defendant was arrested, a small black handgun was found in the car he was driving; a handgun that matched the description of the handgun used against Richard, Daniel, and Ortega.

Furthermore, the trial court twice admonished the jury it could consider the evidence that Daniel was meeting a man named Famous that night for no purpose other than "to demonstrate [Daniel's] state of mind, that he thought he was going down to meet somebody that night." The jurors heard the admonition a third time when the court reporter read back that portion of Daniel's testimony. We presume jurors understand and follow instructions given by the trial court. (*People v. Young* (2005) 34 Cal.4th 1149, 1214.) The trial court's admonitions were clear and straightforward in explaining that Daniel's statement could be used only to demonstrate Daniel's state of mind: that he was going to meet someone that night. The statement could not be used as proof Daniel was going to meet someone named Famous.

Defendant nevertheless asserts the jury could not have disregarded the incriminating nature of Daniel's statement because the inference that defendant, whose neck was tattooed with the word FAMOUS, was the man Daniel went to meet that night was "a coincidence too large and too telling to ignore." To credit defendant's argument would require us to conclude any potentially incriminating evidence lies beyond the ability of a limiting instruction to keep the jury from using the evidence in an impermissible manner. Contrary to defendant's contention, this is not a case in which the evidence subject to the limiting instruction was powerfully incriminating—such as with the confession of a codefendant. (See, e.g., *People v. Aranda* (1965) 63 Cal.2d 518, 530, superseded by statute on another ground as recognized in *People v. Fletcher* (1996) 13 Cal.4th 451, 465.)

11

Notably, the jury asked the court to read back all testimony related to the description and identification of the would-be buyer for the marijuana. Rather than establishing the jury ignored the trial court's admonition, as defendant now contends, these requests from the jury actually establish they heeded the court's admonition. Had the jury ignored the court's admonition, identification of defendant as the man who would buy the marijuana that night was an easy one, not one with which they would have struggled as they apparently did.

We thus conclude the hearsay testimony case here is properly subject to "the almost invariable assumption of the law that jurors follow their instructions" that the United States Supreme Court has "applied in many varying contexts." (*Richardson v. Marsh* (1987) 481 U.S. 200, 206 [95 L.Ed.2d 176].) We adhere to the rule that presumes jurors have understood and followed the instructions given by the trial court. We further conclude there is substantial evidence in the record to support the jury's verdict, such that it is not reasonably probable that in the absence of the court's error, defendant would have received a more favorable verdict.[6]

## II. Section 654

Section 654, subdivision (a) provides, in relevant part, "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." Judicial interpretation holds that section 654 also bars multiple punishment for separate offenses that are committed during an indivisible course of conduct, i.e., with a single criminal intent or objective. " 'Whether a course of criminal conduct is divisible and therefore

---

**6** Defendant forfeited his right to claim on appeal that Daniel's testimony violated his federal right to due process by failing to make that objection in the trial court. (*People v. Millwee* (1998) 18 Cal.4th 96, 128-129.)

12

gives rise to more than one act within the meaning of section 654 depends on the *intent and objective* of the actor.  If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one.' " (*People v. Latimer* (1993) 5 Cal.4th 1203, 1208.)

### A.  *Defendant's Convictions for Carjacking and Assault*

Defendant contends the prison terms imposed on his three convictions for carjacking should be stayed under section 654 because the carjacking and the assault with the firearm arose from the same act or course of conduct as to each victim.  We are not persuaded.

Defendant was convicted of two offenses against each of the three victims, carjacking and assault with a deadly weapon.  He contends that because his objective was carjacking, and because assaulting each of the victims with the firearm was solely for the purpose of achieving that objective, he can be sentenced only for the assault as to each victim and the sentence imposed on each of the carjacking convictions should be stayed. Defendant's argument is not supported by the record.

The trial court explicitly found that section 654 did not apply to defendant's convictions for assault and carjacking because they were serious and violent felonies. The trial court also explicitly found the assaults and the carjackings were "separate and distinct crimes . . . having different purpose and different intent."  We accept a trial court's finding that the defendant harbored a separate intent and objective for each offense if the court's findings are supported by substantial evidence.  (*People v. Williams* (2009) 170 Cal.App.4th 587, 645.)

Here, the evidence showed that defendant waived a gun at Richard and Daniel and told them to back away from the car.  When Ortega saw the gun, she jumped into the car; defendant fought with her inside the car, hit her in the face with the gun, and told her to get out of the car.  Defendant argues this evidence proves defendant's assault of the three

13

victims was solely to effect the carjacking, thus bringing the carjacking convictions within section 654. We disagree.

First, there was no evidence that defendant said to the victims he was waving them off with the gun so he could take their car. Second, we note that the marijuana Richard, Daniel, and Ortega brought that night was still in the car when defendant used his gun to get them away from the car. It is thus equally likely that defendant wanted only to take the marijuana from the car and, only after the delay in getting Ortega out of the car, decided just to take the car, which he quickly abandoned. We thus conclude the court's findings that defendant harbored a separate intent and objective for the assault and carjacking offenses are supported by the record. Accordingly, we find no error.

### B. Possessing a Gun and Possessing Ammunition

Defendant also contends the sentence on his conviction for possessing ammunition must be stayed under section 654 because he cannot be punished for possessing both a gun and the ammunition inside that gun. The People concede the error. Section 654 precludes separate punishment for both possessing a gun and possessing the ammunition loaded inside the gun. (*People v. Lopez* (2004) 119 Cal.App.4th 132, 138.) Here, while there was ammunition found inside the gun and inside the trunk of the car defendant was driving when he was arrested, the People elected to proceed only with the ammunition loaded inside the gun on the ammunition charge. Defendant's sentence for possession of ammunition should, therefore, be stayed.

### DISPOSITION

Defendant's sentence for possession of ammunition (count VIII) is stayed pursuant to section 654. The trial court is hereby directed to amend the abstract of judgment

14

accordingly and forward a certified copy of the amended abstract of judgment to the Department of Corrections and Rehabilitation.  The judgment is otherwise affirmed.


                                                                           _____BUTZ_____, J.


We concur:


_____HULL_____, Acting P. J.


_____MURRAY_____, J.