Filed 10/20/14  P. v. Firman CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D064110 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD239217) |
| MARCO ANTONIO FIRMAN et al., | |
| Defendants and Appellants. | |

APPEALS from judgments of the Superior Court of San Diego County, Peter C. Deddeh, Judge.  Affirmed.

Susan K. Shaler, under appointment by the Court of Appeal, for Defendant and Appellant Marco Firman.

Lynda A. Romero, under appointment by the Court of Appeal, for Defendant and Appellant Paul Salinas.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, Peter Quon, Jr., and Parag Agrawal, Deputy Attorneys General, for Plaintiff and Respondent.

In a four-count amended information, the San Diego County District Attorney charged Marco Antonio Firman and Paul Salinas (together defendants) in count 1 with the first degree murder of Tomas Ray (Pen. Code,[1] § 187, subd. (a).) Count 1 also alleged that defendants committed the murder for the benefit of a criminal street gang (§ 186.22, subd. (b)(1), hereafter section 186.22(b)(1)); that Salinas, in committing the crime, intentionally and personally discharged a firearm (a handgun) causing the victim's death (§ 12022.53, subd. (d)); and that Firman was a principal in the commission of the offense and one of the principals who personally used a firearm (a handgun) causing the victim's death (§ 12022.53, subds. (d), (e)(1)).

Count 2 of the information charged Firman with possession of a firearm by a felon (former § 12021, subd. (a)(1)) and alleged he committed the offense for the benefit of a criminal street gang (§ 186.22(b)(1)).

Count 3 charged Salinas with unlawful possession of a firearm (former § 12021, subd. (d)) and alleged he committed the offense for the benefit of a criminal street gang (§ 186.22(b)(1)).

Last, count 4 charged Salinas with robbery (§ 211, victim: Nathaniel Green). Count 4 also alleged that Salinas committed the offense for the benefit of a criminal street gang (§ 186.22(b)(1)), was a principal in the commission of the offense, and one of the principals who personally used a firearm (§ 12022.53, subds. (b), (e)(1)).

---

[1]     Statutory references are to the Penal Code unless otherwise specified.

2

The information further alleged that Firman had served five prior prison terms (§§ 667.5, subd. (b), 668), had been convicted of one prior serious felony (§§ 667, subd. (a)(1), 668, 1192.7, subd. (c)) and had one prior strike conviction within the meaning of the Three Strikes law (§§ 667, subds. (b)-(i), 1170.12, 668). It also alleged that Salinas had a prior juvenile adjudication that qualified as a strike conviction within the meaning of the Three Strikes law (§§ 667, subds. (b)-(i), 1170.12, 668).

A jury found defendants guilty of all the counts charged against them and found all of the gang and firearm enhancement allegations to be true. Firman admitted the sentence enhancement allegations pertaining to his prior convictions, and the court found Salinas's prior juvenile adjudication qualified as a strike conviction within the meaning of the Three Strikes law.

The court sentenced Firman to an aggregate state prison term of 17 years plus 80 years to life. It sentenced Salinas to an aggregate prison term of 22 years four months plus 75 years to life.

*Contentions*

Firman and Salinas appeal their convictions, asserting both joint and separate contentions. First, Firman (as joined by Salinas) requests that this court independently review the sealed records of the trial court's in camera review on January 9, 2013, of the law enforcement interview of informant David Magana for the purpose of determining whether the trial court "erred, either in procedure or ruling." The Attorney General does not oppose defendants' joint request.

Second, Firman contends his convictions of first degree murder and possession of a firearm by a felon should be reversed because the court violated his federal constitutional rights to confront witnesses and to due process by admitting evidence of Salinas's out-of-court statements to informant Magana, who had been placed in a jail cell with Salinas and who recorded Salinas's statements, which incriminated not only himself but also Firman.

Third, Firman contends his convictions of these same two counts also should be reversed because the court violated his federal and state constitutional rights to due process, confrontation, effective assistance of counsel, and a jury trial when it erroneously admitted testimonial hearsay by permitting one criminalist to testify about the gun residue "test results and opinion" of another criminalist who tested Firman's black hooded sweatshirt for gunshot residue and did not testify at trial.

Fourth, Salinas contends his count 4 conviction of robbing Nathaniel Green should be reversed because his trial counsel provided ineffective assistance by failing to request a jury instruction on voluntary intoxication.

Last, Salinas contends the court erred by not staying under section 654 the execution of the consecutive prison sentence of two years four months it imposed for his count 3 conviction of unlawful possession of a firearm for the benefit of a criminal street gang because he acted with the same objective and intent when he committed this offense and the murder of the victim.

We grant defendants' request for an independent review of the sealed records of the in camera hearing and conclude that nothing therein indicates the court committed

4

any error. For reasons we shall explain, we reject defendants's claims of error and affirm the judgments.

FACTUAL BACKGROUND

A. *The People's Case*

1. *Evidence relating to the shooting*

On December 28, 2009, around 9:30 p.m., Tomas Ray was shot and killed as he walked home. Ray was not a member of any gang. He died from two gunshot wounds, one to the chest and the other to the back of the skull. A third gunshot, which grazed his back, did not penetrate the skin. The bullets recovered from Ray's body were consistent with having been fired from a .38-caliber or .357-caliber revolver. Ray was wearing two silver chains on the night he was shot.

The shooting happened on the corner of Landis Street and Menlo Avenue in the City Heights area of San Diego. Eimar Resendiz and Christian Garcia were walking in the area at the time. Resendiz heard three or four gunshots and saw Ray fall to the ground, but he did not see any suspects. Resendiz asked Hiep Bui, who was nearby, to call the police. Bui, who had just driven past the corner of Landis and Menlo, had seen two men wearing black hooded sweatshirts across the street from a man who was alone. Bui testified he heard three gunshots. He did not know whether the two men he saw on the corner were the same two men who approached him and asked him to call 911.

At the time of the shooting, four San Diego Police Department officers, including Officer Lamar Rozsa, Jr., and his partner, Officer Adam Sharki, were at the City Heights Recreation Center, about eight blocks away from Menlo and Landis. The officers heard

5

three gunshots and drove east toward the shots. Officer Rozsa testified he saw an Hispanic male jump a wall into the alley in the 3800 block of Menlo. The man ran northbound in the alley and then jumped another wall to go westbound. Officer Rozsa exited the patrol car and chased the suspect on foot. He observed that the suspect was wearing a black knit beanie and a black hooded sweatshirt. The suspect ran into a gated area of an apartment complex and escaped. Police officers searched the common area of the apartment complex with trained police dogs. Officer Sharki testified they found some clothes, including a black knit beanie, a black hooded sweatshirt, and a latex glove, all of which looked like the ones the suspect had been wearing.

At trial, Officer Sharki identified Firman as the suspect he chased that night. DNA samples taken from the latex glove, the beanie, and the black hooded sweatshirt matched Firman at a statistical rate of one in 14 quintillion for the glove, one in 40 quintillion for the sweatshirt, and one in 320 quintillion for the beanie. Criminalist Debra Kowal testified that gunshot residue was found on the sweatshirt.

An hour after the shooting, at around 10:30 p.m. that night, Firman called Mauricio Lopez and asked Lopez to pick him up and give him a ride home. Lopez picked Firman up near Firman's girlfriend's apartment on University and 36th. Lopez observed that Firman was agitated and, although it was December, he was wearing shorts and a white tank top. Lopez drove Firman home.

In June 2010, about six months after the shooting, police began to focus their investigation on Firman and Salinas based on information received from a confidential informant.

6

David Magana, another informant, began to work with the police in January of 2012, two years after the shooting. Magana signed a formal contract with the district attorney's office and agreed to act as an informant and join the witness protection program in exchange for the prosecutor's recommendation that he receive credit for time served in a pending case.

Magana testified that he was a member of the City Heights Juniors gang at the time of the shooting. This was the same gang to which Firman and Salinas belonged. Magana's gang monikers were "Nutty Boy" and "Maniac." Firman's nicknames were "Midget" and "Cynic." Magana's role in the gang was to acquire guns and dispense them to fellow gang members.

Magana testified that one and a half weeks after the shooting, he and Firman were at Magana's house smoking methamphetamine. Firman and Magana talked about the shooting, and Firman said he and Salinas, whose gang name was "Scrappy," were walking down the street by "Joker's"[2] house. Firman told Magana that he and Salinas "gang bang[ed]" a guy, meaning they asked him where he was from. The guy said, "Nowhere." Firman also told Magana he took a swing at the guy and tried to take his chain, and then Salinas shot him. They then split up and ran in different directions. Firman said the police chased him, he dumped his clothes, he hid his gun, and ran toward Joker's (Ortega's) house. Firman told Magana he had a .22-caliber gun that night, and Salinas had a .38-caliber gun. Firman also said Ortega got both of the guns back.

---

[2] Rosman Ortega, a City Heights Juniors gang member, was known as Joker.

Ortega lived near the scene of the shooting. The prosecution's gang expert opined that Ortega was one of the leaders of the City Heights Juniors gang. Ortega lived with his mother in an area predominantly claimed by their rival gang, Eastside San Diego.

Magana testified that he spoke with Salinas a few days after Magana's conversation with Firman. Salinas told Magana he got his "K" or "QK" ("Ques[e]ro killer"), which meant he had just committed murder. "Quesero" (or "Cheeser") is a derogatory term that members of the City Heights Juniors gang used to describe members of their rival street gang, Eastside San Diego.

a. *Salinas's audio-recorded jailhouse statements to Magana*

As part of his contract with the district attorney's office, Magana agreed to wear a recording device and speak with Salinas about the shooting. On February 16, 2012, Magana and Salinas were placed in the same jail cell and their conversation was recorded. Portions of the recording of that conversation were played for the jury.

During the recorded jail cell conversation, Salinas indicated to Magana that he was nervous about the case after a police officer—who the record shows was Detective Javier Padilla—interviewed him in September 2010 and showed him pictures of Firman and Magana. Salinas also indicated he had lied to Detective Padilla by saying that he did not recognize the people in the pictures. Salinas indicated to Magana that he (Salinas) knew about the murder, but that law enforcement did not have proof he was the perpetrator. Magana asked Salinas about a letter Salinas wrote from prison in which Magana was mentioned along with the murder. In response, Salinas assured Magana that he was not

implicating Magana in the murder, but was just questioning whether Magana or Firman had been contacted by law enforcement about the murder.

During the recorded conversation, Magana also told Salinas that he had heard from Firman that Firman's DNA had been found at the murder scene. Salinas replied that he (Salinas) would just have to "ride it out."

Later during their jail cell conversation, Magana informed Salinas that Firman had said he (Firman) had wanted to steal "that fool['s]" chain. Salinas asked Magana, "Which one?" Magana replied, "That day, fool, when you, *when [you] guys smoked*[3] *that one fool*." (Italics added.) Salinas then asked, "What did [Firman] say?" Magana told Salinas, "Yeah, you guys wanted to get his chain," and then said (referring to Firman), "That fool's like, 'I just wanted his chain[,] fool . . . ." Also referring to Firman, Salinas then told Magana, "That fool was telling me [to] *let him have it*."[4] (Italics added.) Magana then told Salinas that Firman had said he (Firman) had tried to "sock" the victim because he wanted to take his gold chain. Magana then accused Salinas of killing the victim, stating, "[Y]ou just smoked that fool." Salinas responded that he thought the victim was a Quesero. Salinas did not deny his involvement in the murder.

During the recorded conversation with Magana, Salinas repeatedly referred to the "hot one," a term he used to refer to the murder weapon—the .38-caliber "special"

---

3    At trial Detective Padilla testified that the term "smoke" somebody means to shoot and kill somebody.

4    Detective Padilla testified that Salinas's phrase "let him have it" meant to shoot the victim with a firearm.

9

handgun. Salinas talked about "burn[ing]" or "bury[ing]" the "hot one" and told Magana he had asked Joker (Ortega) to break the gun into pieces and burn it. Detective Padilla testified at trial that Salinas's comments to Magana were significant because they indicated Salinas had told Ortega to get rid of the evidence.

2. *Evidence relating to Salinas's robbery offense*

During Magana's February 2012 recorded conversation with Salinas in the jail cell, Salinas revealed that he had been involved in a robbery. Specifically, Salinas revealed that he and his fellow gang members lined up 10 people against a wall and stole various items from the victims' pockets: an I-Pod Touch, eye drops, cologne, "feria" (money), a cell phone, and a Black and Mild cigar. Salinas said he "was fucked up" during the robbery, which meant Salinas was either drunk or "messed up" on drugs.

San Diego Police Department Detective Rudy Castro testified that, based on these statements by Salinas to Magana, he reactivated an investigation into an unsolved robbery. That robbery was committed in the City Heights area of San Diego at around 10:00 p.m. on January 14, 2010. A group of 13 or 14 young men who were standing outside of an apartment complex on 49th Street were approached by four Hispanic men. Three were wearing dark hooded sweatshirts and had bandanas over their faces. The one who was not wearing a hooded sweatshirt and did not have a bandana over his face was wearing a Padres jersey. The Hispanic men said that area was a "Juniors' block" and ordered the young men to empty their pockets. The Hispanic men carried weapons. One had a revolver, one had a small chain saw, one had a hammer, and the one who wore a Padres jersey had a screwdriver. They went through the young men's pockets. They took

10

a white lighter and a Black and Mild cigar from Nathaniel Green, and took cash and a cell phone from another person. From a six-pack photographic lineup, Green identified Ortega as the man in the Padres jersey.

Five days after the robbery, on January 19, 2010, Officer Carmelin Rivera was on duty driving his patrol car in City Heights. He drove into an alley and saw a man, later identified as Salinas, who looked at his patrol car and immediately started running. Officer Rivera got out of his patrol car and chased Salinas on foot. He saw Salinas throw a gun under a parked car. Soon thereafter, Salinas stopped running and Officer Rivera and another officer took him into custody. Salinas had a white lighter, a cell phone, some cash, and a cell phone in his pockets. The gun was a fully loaded .22-caliber revolver.

3. *Gang evidence*

The prosecution's gang expert opined that Firman and Salinas were both members of the City Heights Juniors street gang. Eastside San Diego, which is the largest street gang in San Diego, is City Heights Juniors's main rival. City Heights Juniors claimed a small area within the territory claimed by Eastside San Diego. The shooting in this case occurred a block south of the territory claimed by the City Heights Juniors gang. The day after the shooting, detectives noticed graffiti about a block away from the crime scene that depicted a bullseye target around the letters ESD, which meant another gang was targeting Eastside San Diego.

The primary activities of the City Heights Juniors gang included assaults with weapons.

11

For purposes of count 2 (which charged Firman with possession of a firearm by a felon) and count 3 (which charged Salinas with unlawful possession of a firearm), the parties stipulated that Firman had five prior felony convictions for each of which he had served a prison commitment and that Salinas was prohibited from possessing firearms by a court order as an expression condition of probation prior to the shooting in this case.

B. *Defense Evidence*

Salinas presented no evidence.

Firman testified that he was a member of the City Heights Juniors gang, and on the night of the murder he was not at the murder scene. He was trying to break into and steal cars, and he was wearing a black sweatshirt, a beanie, and gloves. He stated he walked past several cars, but did not break into a car that night. Firman admitted he did not previously tell officers that he was simply trying to break into cars.

Firman testified that he did not break into any cars because he heard police cars driving toward him. He stated that he did not remember whether he heard gunshots that night and that he began running when he heard the sound of police-vehicle tires because he was on parole. He hopped over a fence, ran into an apartment complex, and hid there behind some bushes. Firman testified that he took off his sweatshirt, beanie and gloves, and stated that he did not know why he did that. He hopped over another fence and walked to his girlfriend's house. Lopez picked him up there and drove him home.

Firman also testified he never talked to Magana about the shooting, he was never on the corner of Menlo and Landis that night, he was not with Salinas that night, and he

12

did not tell anybody to shoot anyone.  Firman indicated he had heard of Salinas before the shooting and had only met him once when they were in Donovan State Prison.

A defense investigator indicated he ran from the location of the shooting to where Firman was first seen running from police officers.  He ran a distance of 430 yards.  It took him 57 seconds to run that distance.  Another defense investigator testified that the world record for the 440-yard dash is 44.58 seconds.

Officer Sharki testified he first saw Firman about 40 seconds after he heard the gunshots.

## DISCUSSION

### I. *REVIEW OF SEALED RECORDS OF IN CAMERA HEARING*

Asserting they are entitled under section 1054.1[5] to "discovery of more than merely 'exculpatory' evidence," Firman and Salinas request that this court independently review the sealed records of the trial court's in camera review on January 9, 2013, of the law enforcement interview of informant Magana for the purpose of determining whether

---

5     Section 1054.1 provides:  "The prosecuting attorney shall disclose to the defendant or his or her attorney all of the following materials and information, if it is in the possession of the prosecuting attorney or if the prosecuting attorney knows it to be in the possession of the investigating agencies:  [¶] (a) The names and addresses of persons the prosecutor intends to call as witnesses at trial. [¶] (b) Statements of all defendants. [¶] (c) All relevant real evidence seized or obtained as a part of the investigation of the offenses charged. [¶] (d) The existence of a felony conviction of any material witness whose credibility is likely to be critical to the outcome of the trial. [¶] (e) Any exculpatory evidence. [¶] (f) Relevant written or recorded statements of witnesses or reports of the statements of witnesses whom the prosecutor intends to call at the trial, including any reports or statements of experts made in conjunction with the case, including the results of physical or mental examinations, scientific tests, experiments, or comparisons which the prosecutor intends to offer in evidence at the trial."

13

the trial court "erred, either in procedure or ruling." The Attorney General does not oppose defendants' joint request.

The sealed record in question consists of a 13-page reporter's transcript of the in camera hearing. Having read and considered the transcript, we conclude that nothing therein indicates the court committed any error or that defendants' rights were violated.

## II. *SALINAS'S RECORDED JAILHOUSE STATEMENTS TO INFORMANT MAGANA (FIRMAN'S BRUTON/CRAWFORD CLAIM)*

Firman contends his convictions of first degree murder and possession of a firearm by a felon should be reversed because the court violated his federal constitutional rights to confront witnesses and to due process by admitting evidence of Salinas's out-of-court statements to informant Magana, who had been placed in a jail cell with Salinas and who recorded Salinas's statements that incriminated both himself and Firman. We reject that contention.

A. *Background*

1. *Salinas's recorded jailhouse statements to Magana the implicated Firman*

During his recorded jailhouse conversation with Magana (discussed more fully in the factual background, *ante*), Salinas implicated Firman in the murder of the victim. Referring to Firman, Salinas told Magana, "That fool was telling me [to] let him have it." Detective Padilla testified that Salinas's phrase "let him have it" meant to shoot the victim with a firearm. Magana then accused Salinas of killing the victim, stating, "[Y]ou just smoked that fool." Salinas responded that he thought the victim was a Quesero. Salinas

14

told Magana that it was Midget (Firman) who told Salinas that the victim was "[c]heesin it," meaning the victim was a member of the rival Eastside San Diego gang.

2. *Firman's severance motion*

In a pretrial motion Firman requested that his trial be severed from Salinas's trial. Citing *Bruton v. United States* (1968) 391 U.S. 123 (*Bruton*) and *People v. Aranda* (1965) 63 Cal.2d 518 (*Aranda*), (together *Aranda/Bruton*), Firman claimed that admission into evidence of Salinas's recorded jailhouse statements to Magana would violate Firman's right to confrontation as set forth in *Aranda/Bruton* because the extrajudicial statements were "testimonial" within the meaning of *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*), they implicated Firman in the murder and it was unlikely Salinas would testify in a joint trial and be subject to cross-examination.

In support of his motion, Firman also claimed Salinas's statements were not declarations against Salinas's penal interest, and thus they were inadmissible hearsay, because Salinas perceived he was talking to another gang member, he had a motivation to be untruthful about whether he had committed a criminal act, and thus there were insufficient indicia of reliability for the hearsay exception for declarations against interest (Evid. Code, § 1230) to apply.

Citing *People v. Arceo* (2011) 195 Cal.App.4th 556 (*Arceo*) and *People v. Arauz* (2012) 210 Cal.App.4th 1394 (*Arauz*), the prosecutor opposed Firman's severance motion, arguing Salinas's statements were not testimonial and the hearsay exception for declarations against interest applied.

15

a. *Ruling*

The court denied Firman's severance motion, finding that Salinas's statements to Magana were not testimonial, and thus the admission of the statements would not violate *Crawford*, because a reasonable person in Salinas's position would not have believed the conversation with Magana was a custodial interrogation, and no other category of "testimonial" statement applied. The trial court analogized the jailhouse conversation to a pretextual call that would not be considered testimonial, and noted that the relevant question was whether a reasonable person in a similar situation would believe he was being interrogated. The court explained its reasoning:

> "To me, [Salinas is] confiding in a friend. His friend is trying to get him to say things that are incriminating, but this is a trust relationship. This is . . . a trust relationship because they are homeboys. They grew up in the same neighborhood. They have probably had many experiences together, criminal experiences, and just hanging-out experiences. So he's trusting him with his personal information and confiding in him about things that are personal."

The court also found the statements were against Salinas's penal interest within the meaning of the exception to the hearsay rule for declarations against interest (Evid. Code, § 1230) because Salinas admitted he had committed a crime. The court further found that any motivation Salinas may have had to lie could be presented to the jury, but it was not a basis to exclude his statements.

B. *Applicable Legal Principles*

1. Aranda/Bruton *and the Sixth Amendment right of confrontation*

"The confrontation clause of the Sixth Amendment to the federal Constitution, made applicable to the states through the Fourteenth Amendment, provides that '[i]n all

16

criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him.'  The right of confrontation includes the right of cross-examination."  (*People v. Fletcher* (1996) 13 Cal.4th 451, 455 (*Fletcher*).)

A recurring problem in the application of the Sixth Amendment right of confrontation concerns an out-of-court statement by one defendant that incriminates both that defendant and a jointly charged codefendant.  (*Fletcher*, *supra*, 13 Cal.4th at p. 455.) "Generally, the [out-of-court statement] will be admissible in evidence against the defendant who made it (the declarant)."  (*Ibid.*, citing Evid. Code, § 1220 [hearsay exception for party admissions].)

In *Bruton*, *supra*, 391 U.S. 123, "[t]he United States Supreme Court . . . held that, because jurors cannot be expected to ignore one defendant's confession that is 'powerfully incriminating' as to a [codefendant] when determining the latter's guilt, admission of such a confession at a joint trial generally violates the confrontation rights of the nondeclarant."  (*Fletcher*, *supra*, 13 Cal.4th at p. 455, citing *Bruton*, at pp. 126-137.)  In *Aranda*,[6] *supra*, 63 Cal.2d 518, the California Supreme Court "reached a similar conclusion on nonconstitutional grounds."  (*Fletcher*, at p. 455, citing *Aranda*, at pp. 528-530.)

---

[6]    To the extent the judicially declared rule of practice set forth in *Aranda*, *supra*, 63 Cal.2d 518, requires the exclusion of relevant evidence that would not be excluded under federal constitutional law, it was abrogated in 1982 by Proposition 8.  (Cal. Const., art. I, § 28, subd. (d); *Fletcher*, *supra*, 13 Cal.4th at p. 465.)  To the extent *Aranda* corresponds with *Bruton*, *supra*, 91 U.S. 123, it was not abrogated by Proposition 8.  (*People v. Orozco* (1993) 20 Cal.App.4th 1554, 1564.)

17

Thus, Aranda/Bruton barred admission, at a joint trial, of a nontestifying defendant's out-of-court statement that incriminated a codefendant, even if the court instructed the jury to consider the statement in determining the guilt only of the declarant, because admission of the statement violated the codefendant's Sixth Amendment right of confrontation. (*Bruton*, *supra*, 391 U.S. at pp. 126, 135-137; *Aranda*, *supra*, 63 Cal.2d at pp. 529-530; *Fletcher, supra*, 13 Cal.4th at p. 455.)

*Crawford*, *supra*, 541 U.S. 36, and its progeny altered the Aranda/Bruton Sixth Amendment analysis. In *Crawford*, the United States Supreme Court held that the confrontation clause bars "admission of *testimonial* statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." (*Crawford*, at pp. 53-54, italics added.)

The contours of the confrontation clause and the meaning of "testimonial" have remained elusive because the high federal court has not defined, for purposes of that clause, precisely who is a witness and what constitutes testimony. (See *Melendez-Diaz v. Massachusetts* (2009) 557 U.S. 305, 309-310 (*Melendez-Diaz*); *Davis v. Washington* (2006) 547 U.S. 813, 826-827 (*Davis*); *Crawford*, *supra*, 541 U.S. at pp. 51-52.)

However, the Supreme Court has described a "core class of 'testimonial' statements" that are covered by the confrontation clause, the various formulations of which include (1) "'ex parte in-court testimony or its functional equivalent─that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially'[; (2)] 'extrajudicial . . . statements contained

18

in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions'[; and (3)] 'statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.'" (*Crawford*, *supra*, 541 U.S. at pp. 51-52, italics omitted; *Melendez-Diaz*, *supra*, 557 U.S. at pp. 309-310.)

In *People v. Dungo* (2012) 55 Cal.4th 608 (*Dungo*), the California Supreme Court recently reviewed *Crawford*, *supra*, 541 U.S. 36, and its progeny─including *Williams v. Illinois* (2012) 567 U.S. ___ [132 S.Ct. 2221]─and explained that "[a]lthough the high [federal] court has not agreed on a definition of 'testimonial,' testimonial out-of-court statements have two critical components. First, to be testimonial the statement must be made with some degree of formality or solemnity. Second, the statement is testimonial only if its primary purpose pertains in some fashion to a criminal prosecution. The high court justices have not, however, agreed on what the statement's primary purpose must be." (*Dungo*, at p. 619.)

*Crawford* altered the Aranda/Bruton Sixth Amendment analysis by implying that the Sixth Amendment does not bar the admission of *nontestimonial* hearsay, stating: "[N]ot all hearsay implicates the Sixth Amendment's core concerns." (*Crawford*, *supra*, 541 U.S. at p. 51; *People v. Garcia* (2008) 168 Cal.App.4th 261, 290.)

In *Davis*, *supra*, 547 U.S. 813, the United States Supreme Court directly addressed the question of "whether the Confrontation Clause applies only to *testimonial* hearsay" and held that it does. (*Id*. at p. 823.) *Davis* explained that "[o]nly [testimonial statements] cause the declarant to be a 'witness' within the meaning of the Confrontation

19

Clause. [Citation.] It is the testimonial character of the statement that separates it from other hearsay that, while subject to traditional limitations upon hearsay evidence, is not subject to the Confrontation Clause." (*Davis,* at p. 821.)

Thus, as we explained in *People v. Garcia, supra*, 168 Cal.App.4th 261, "*Davis* expressly held what *Crawford* suggested—that 'nontestimonial hearsay is not subject to the Confrontation Clause.'" (*People v. Garcia*, at p. 291, quoting *U.S. v. Tolliver* (7th Cir. 2006) 454 F.3d 660, 665, fn. 2 & citing *People v. Cage* (2007) 40 Cal.4th 965, 984 ["the confrontation clause is concerned solely with hearsay statements that are testimonial"].) Accordingly, as we further explained in *Garcia*, "after *Davis*, the determination of whether the admission of a hearsay statement violates a defendant's rights under the confrontation clause turns on whether the statement is testimonial. If the statement is *testimonial*, it must be excluded unless the declarant is unavailable as a witness and the defendant had a prior opportunity to cross-examine the declarant. If the statement is *not testimonial*, it does not implicate the confrontation clause, and the issue is simply whether the statement is admissible under state law as an exception to the hearsay rule." (*People v. Garcia*, at p. 291, italics added; *People v. Gutierrez* (2009) 45 Cal.4th 789, 812 ["Only the admission of testimonial hearsay statements violates the confrontation clause—unless the declarant is unavailable and the defendant had a prior opportunity to cross-examine the declarant."].)

C. *Analysis*

Relying primarily on *Bruton, supra*, 391 U.S. 123, Firman contends the trial court committed prejudicial evidentiary error by admitting into evidence Salinas's recorded

20

jailhouse statements to Magana. Firman also contends that under *Crawford*, *supra*, 541 U.S. 36, the erroneous admission of Salinas's extrajudicial statements violated Firman's Sixth Amendment right of confrontation and cross-examination because the statements implicated him in the murder, the statements were testimonial, and he was not able to cross-examine Salinas about those statements. We reject these contentions and conclude the evidence of Salinas's jailhouse statements was admissible because the statements were not testimonial, Salinas made the statements against his own penal interests within the meaning of the exception to the hearsay rule set forth in Evidence Code section 1230, and the statements bore sufficient indicia of reliability.

As already discussed, the determination of whether the admission of a hearsay statement in a criminal case violates a defendant's rights under the confrontation clause "turns on whether the statement is testimonial." (*People v. Garcia*, *supra*, 168 Cal.App.4th at p. 291.) If the statement is not testimonial, it does not implicate the defendant's Sixth Amendment rights and "the issue is simply whether the statement is admissible under state law as an exception to the hearsay rule." (*Ibid.*) To be testimonial, an out-of-court statement must satisfy two requirements: (1) "the statement must be made with some degree of formality or solemnity," and (2) the "primary purpose" of the statement must "pertain[] in some fashion to a criminal prosecution." (*Dungo*, *supra*, 55 Cal.4th at p. 619.)

Here, Salinas's jailhouse statements to Magana were not testimonial within the meaning of *Crawford*, *supra*, 541 U.S. 36, and its progeny. We are guided in our analysis by *Davis*, *supra*, 547 U.S. 813, and the recent decision in *Arauz*, *supra*, 210

21

Cal.App.4th 1394. In *Davis*, the United States Supreme Court gave examples of extrajudicial statements that were "clearly nontestimonial," including "statements made unwittingly to a Government informant." (*Davis*, at p. 825.) The Court of Appeal in *Arauz*, following *Davis*, held that "statements unwittingly made to an informant are not 'testimonial' within the meaning of the confrontation clause." (*Arauz*, at p. 1402.)

Similarly here, the record (discussed, *ante*) establishes that Salinas unwittingly made his recorded jailhouse statements to a government informant, Magana. Accordingly, we conclude Salinas's extrajudicial statements incriminating Firman were "clearly nontestimonial" within the meaning of *Crawford*, *supra*, 541 U.S. 36 and its progeny for purposes of Sixth Amendment analysis. (*Davis*, *supra*, 547 U.S. at p. 825; *Arauz*, *supra*, 210 Cal.App.4th at p. 1402.)

As Salinas's statements are "not testimonial, [they do] not implicate the confrontation clause, and the issue is simply whether the statement is admissible under state law as an exception to the hearsay rule." (*Garcia*, *supra*, 168 Cal.App.4th at p. 291.)

Here, the evidence of Salinas's statements to Magana bore sufficient indicia of reliability to admissible under the hearsay exception for declarations against penal interest codified in Evidence Code section 1230.[7] Our Supreme Court has summarized

---

[7] Evidence Code section 1230 provides in part: "Evidence of a statement by a declarant having sufficient knowledge of the subject is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and the statement, when made, . . . so far subjected him to the risk of . . . criminal liability, . . . that a reasonable man in his position would not have made the statement unless he believed it to be true."

the law applicable to the declaration against penal interest exception to the hearsay rule:

"'Evidence Code section 1230 provides that the out-of-court declaration of an unavailable witness may be admitted for its truth if the statement, when made, was against the declarant's penal interest. The proponent of such evidence must show "that *the declarant is unavailable*, that *the declaration was against the declarant's penal interest*, and that *the declaration was sufficiently reliable* to warrant admission despite its hearsay character."' [Citation.] 'The focus of the declaration against interest exception to the hearsay rule is the basic trustworthiness of the declaration. [Citations.] In determining whether a statement is truly against interest within the meaning of Evidence Code section 1230, and hence is sufficiently trustworthy to be admissible, the court may take into account not just the words but the circumstances under which they were uttered, the possible motivation of the declarant, and the declarant's relationship to the defendant.'" (*People v. Geier* (2007) 41 Cal.4th 555, 584, italics added, disapproved on another point by *Melendez-Diaz*, *supra*, 557 U.S. 305, as acknowledged in *People v. Houston* (2012) 54 Cal.4th 1186, 1220.) "A trial court's decision to admit or exclude evidence is a matter committed to its discretion '"and will not be disturbed except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice."'" (*Geier*, *supra*, at p. 585.)

Here, the court did not abuse its discretion in finding that Salinas's challenged jailhouse statements to Magana were admissible under Evidence Code section 1230 as declarations against penal interest. First, Salinas was unavailable as a witness because, consistent with the Fifth Amendment, he refused to testify and the prosecution could not

23

call him to the stand. (*People v. Fuentes* (1998) 61 Cal.App.4th 956, 961-962 ["A declarant who asserts his or her Fifth Amendment privilege not to testify is 'unavailable' within the meaning of [Evidence Code section 1230]."].)

Second, Salinas's statements implicated him as the shooter,[8] and thus were against his penal interest because they showed that he committed first degree murder, that he personally discharged a firearm causing death, and that he was acting on the behalf of a criminal street gang for the benefit of that gang.

Last, the statements bore sufficient indicia of reliability. Salinas relies on *Lilly v. Virginia* (1999) 527 U.S. 116, a pre-*Crawford* case. However, as the *Arceo* court correctly pointed out, *Lilly* "observed that '[w]hen a court can be confident . . . "the declarant's truthfulness is so clear from the surrounding circumstances that the test of cross-examination would be of marginal utility," the Sixth Amendment's residual "trustworthiness" test allows the admission of the declarant's statements.'" (*Arceo*, *supra*, 195 Cal.App.4th at p. 577, quoting *Lilly*, *supra*, at p. 136.)

Here, "[i]n addition to the 'reasonable assurance' of the veracity that ordinarily flows from a person's interest in not being criminally implicated [citation], the circumstances surrounding [Salinas's] statements confirm their reliability. [Salinas's] statements were not made in a custodial context or in any other context remotely close to

---

8     During the recorded jailhouse conversation, Magana accused Salinas of killing the victim by telling Salinas, "[Y]ou just smoked that fool." Acknowledging he shot the victim, Salinas responded that he thought the victim was a Quesero. Salinas did not deny his involvement in the murder. He also told Magana he had asked Joker (Ortega) to break the murder weapon (the gun he referred to as the hot one) into pieces and burn it.

24

'an accomplice's statements that shift or spread the blame' to another. [Citation.] Instead, [his] statements were made in '"the most reliable circumstance,"' that is, '"one in which the conversation occurs between friends in a noncoercive setting that fosters uninhibited disclosures."'" (*Arceo*, *supra*, 195 Cal.App.4th at p. 577, fn. omitted.) Here, Salinas's statements did not shift any blame away from him. His statements identified himself as the shooter and acknowledged he was acting for the benefit of a criminal street gang of which he, Magana, and Firman all were members.

For all of the foregoing reasons, we conclude the court did not abuse its discretion or violate Firman's federal constitutional rights to confront witnesses and to due process by admitting evidence of Salinas's out-of-court statements to informant Magana.

### III. *EXPERT TESTIMONY OF CRIMINALIST KOWAL* (*FIRMAN'S SIXTH AMENDMENT CLAIM*)

Firman next contends his convictions of first degree murder and possession of a firearm by a felon also should be reversed because the court violated his federal and state constitutional rights to due process, confrontation, effective assistance of counsel, and a jury trial when it erroneously admitted testimonial hearsay by permitting criminalist Kowal to testify about the gun residue "test results and opinion" of criminalist Margaret Kaleuati, who tested Firman's black hooded sweatshirt for gunshot residue and did not testify at trial. In a related contention, Firman asserts that Kowal "did not form or express her own opinion" and, after reviewing Kaleuati's analysis, she "agreed" with Kaleuati's test findings that there were a few "characteristic particles," and many

25

"consistent particles," of gunshot residue on the test sample taken from Firman's sweatshirt.  We reject these contentions.

A.  *Background*

In this case two criminalists at the Los Angeles Department of Coroner tested the black hooded sweatshirt that belonged to Firman and a navy blue sweatshirt for gunshot residue.  Kowal, the criminalist who testified for the prosecution in this case, personally tested the navy blue hooded sweatshirt and found "many consistent particles[9] of gunshot residue."  Kowal's nontestifying colleague, Kaleuati, tested Firman's black hooded sweatshirt.

1.  *Firman's motion to exclude Kowal's testimony*

Prior to Kowal's testimony in this case, Firman's counsel filed a motion seeking an order "prohibit[ing] Kowal from testifying from the contents of Kaleuati's reports and tests."  In his motion, Firman argued that, if the court permitted Kowal to testify from Kaleuati's report, the court should "prohibit Kowal from discussing Kaleuati's opinions and the details of her report."  Citing *Melendez-Diaz*, *supra*, 557 U.S. 305, Firman claimed that Kaleuati's "reports" were testimonial, and thus allowing Kowal to testify to the gunshot residue testing performed by Kaleuati would violate his confrontation rights

---

9       Kowal indicated there are two categories of particles that are relevant to gunshot residue testing:  "characteristic" particles and "consistent" particles.  She explained that a "characteristic particle" is made up of only "three chemical components, lead, barium, and antimony," and such a particle comes "from the discharge of a firearm."  She also explained that "consistent particle[s]" are "those other particles that I mentioned, the lead and barium, the lead and antimony. . . .  If I find lead and barium, lead and antimony, or just lead, those are certainly part of the particles that can be produced in the discharge of a firearm, but they could also come from an environmental source."

under the Sixth and Fourteenth Amendments to the federal Constitution because there was no showing Kaleuati was unavailable to testify, and he had no prior opportunity to cross-examine her. Citing *Dungo*, *supra*, 55 Cal.4th 608, Firman acknowledged that "[a]utopsy reports have been found generally to be non-testimonial" because "[t]hey are mandated by law and have purposes other than criminal prosecution." Citing *People v. Lopez* (2012) 55 Cal.4th 569 (*Lopez*), he also acknowledged that "[p]ortions of DNA analysis have been found to be non-testimonial," and that "[a] computer[-]produced document is not testimonial as long as it does not contain an operator's claim of validity of the data" because "a machine can never be cross-examined."

Citing *Lopez*, *supra*, 55 Cal.4th 569 and *Dungo*, *supra*, 55 Cal.4th 608, the prosecutor opposed Firman's motion to exclude Kowal's testimony, arguing that it would be "burdensome" for the Los Angeles Department of Coroner "to have both Kowal and Kaleuati come down" to testify in this case, and that the case law allowed Kowal to testify as to her own conclusions based on another criminalist's (Kaleuati's) notes.

a. *Ruling*

Following a hearing, the court denied Firman's motion. The court stated it would allow Kowal "to testify about what [Kaleuati] did" because "[i]t is official record. It is something [Kowal] can review and comment on, because she has expertise for what the evidence is" and she could "look at it and say, 'This is something we use in our lab. This is a procedure we follow [and, u]ltimately, she will say she came to this conclusion."

27

## 2. *Kowal's expert testimony*

Kowal testified that testing for gunshot residue consisted of using a dime-size aluminum disk with sticky tape on the surface—which was attached to a vile to allow the tester to hold onto it—to dab the item being tested and lift particulate material from that item. A carbon coating was added to the sticky disks, each disk was fitted into a larger disk, placed in a glass container, and then placed in the vacuum chamber for the scanning electron microscope. She explained that the electron microscope has an energy dispersive X-ray spectrometer, an instrument that "can run on automation" and allowed her to determine what elements were in a particular particle. Kowal stated there was a calibration standard that could tell her whether the energy dispersive X-ray spectrometer was functioning properly. She further explained that there was a "[gunshot residue] thread standard sample in there as well" and that sample "ha[d] [gunshot residue] particles on it" that allowed her to know "it's operating well and it's finding small, lead particles." Kowal stated she used the instrument "to scan the surface" of the disk to "search for particles of interest [and] capture a spectra of the particles it found." The instrument produced a list of the particles it found with an accompanying spectra for each particle. Kowal indicated she reviewed this list and the spectra to determine whether the particles were "characteristic" particles of gunshot residue or were "consistent" particles.[10]

---

[10]    See fn. 9, *ante*.

Kowal testified that, with respect to the black hooded sweatshirt that Kaleuati tested, her role was to act as the technical reviewer. Stating that "all of our work has to be technically reviewed by somebody that is also competent in the same analysis," Kowal explained that she went "to the instrument where [Kaleuati] performed this analysis and [she] reviewed the images that [Kaleuati] collected and the spectra she collected for each of the items—for each of the particles she saved to come to her conclusion. [¶] I determined whether I agreed with what [Kaleuati] saw and made note of."

Kowal then testified that she "agreed to the conclusion that [Kaleuati] came to" regarding the black hooded sweatshirt. Stating that she "reviewed all of [Kaleuati's] notes and paperwork" regarding "the work done" on the sweatshirt, Kowal testified that Kaleuati "found a few characteristic particles and many consistent particles of gunshot residue on the black hooded sweatshirt." The prosecutor asked Kowal, "Did you agree with those findings *after looking at the data*?" Kowal replied, "Yes, I did."

Regarding the characteristic particles found on the black hooded sweatshirt, Kowal opined that "it could be that the person wearing this [sweatshirt] discharged a firearm. Could be that they were standing nearby when a firearm discharged or that this sweatshirt came in contact with some surface such as a firearm, and it could have transferred that way." The prosecutor again asked Kowal whether she agreed with the results of Kaleuati's testing of the black hooded sweatshirt when Kowal looked at the machine, and Kowal responded that she did.

B.  *Analysis*

In support of his claim of constitutional error in violation of the confrontation clause of the Sixth Amendment, Firman primarily relies on *Melendez-Diaz*, *supra*, 557 U.S. 305, *Bullcoming v. New Mexico* (2011) 564 U.S. ___ [131 S.Ct. 2705], and *Williams v. Illinois, supra*, 132 S.Ct. 2221.  However, we must follow *Lopez*, *supra*, 55 Cal.4th 569 and *Dungo*, *supra*, 55 Cal.4th 608─which the California Supreme Court's decided in October 2012 after considering *Melendez-Diaz*, *Bullcoming*, and *Williams* (see *Dungo*, at p. 616)─because we are bound by California Supreme Court precedent.  (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

In *Lopez* our Supreme Court explained that, under the high federal court's "quartet of cases"─*Crawford*, *supra*, 541 U.S. 36; *Melendez-Diaz*, *supra*, 557 U.S. 305; *Bullcoming v. New Mexico*, *supra*, 131 S.Ct. 2705; and *Williams v. Illinois, supra*, 132 S.Ct. 2221─"the prosecution's use at trial of testimonial out-of-court statements ordinarily violates the defendant's right to confront the maker of the statements unless the declarant is unavailable to testify and the defendant had a prior opportunity for cross-examination." (*Lopez*, *supra*, 55 Cal.4th at p. 581; accord, *Dungo*, *supra*, 55 Cal.4th at pp. 616, 619.)  *Lopez* and *Dungo* also explained that, although the United States Supreme Court has not agreed on a definition of "testimonial," under its just-mentioned quartet of cases a testimonial out-of-court statement has two critical components.  First, to be testimonial the out-of-court statement "must [be] made with some degree of formality or solemnity." (*Ibid.*)  Second, the out-of-court statement is testimonial "only if its primary

purpose pertains in some fashion to a criminal prosecution." (*Id.* at pp. 581-582; *Dungo*, at pp. 616, 619.)

Here, with respect to the solemnity component of a testimonial out-of-court statement, Firman has not shown, and cannot demonstrate, that what he refers to as the "test results and opinion" contained in the notes of the nontestifying criminalist, on which the prosecution's criminalist relied and about which she testified, were made with the requisite degree of formality or solemnity to be considered testimonial for purposes of the confrontation clause of the Sixth Amendment. We are guided in our analysis by our Supreme Court's *Lopez* decision.

In *Lopez* a jury convicted the defendant of vehicular manslaughter while intoxicated. (*Lopez*, *supra*, 55 Cal.4th at p. 573.) At trial the prosecution's criminalist, John Willey, testified that he had reviewed a laboratory report prepared by his colleague, Jorge Peña, who had analyzed defendant's blood sample. (*Id*. at p. 574.) Peña did not testify, and the prosecution did not show he was unavailable as a witness. (*Ibid*.) Willey testified that he had been employed in the laboratory for more than 17 years, he knew its procedures for processing blood samples for alcohol analysis, and he had trained Peña and was intimately familiar with Peña's procedures and how Peña tested blood samples for alcohol. (*Ibid*.) Referring to Peña's report, Willey testified that Peña used a gas chromatograph to analyze the defendant's blood sample, and Peña's analysis showed the defendant's blood-alcohol concentration was 0.09 percent. (*Ibid*.) Willey also testified that, based on his own "separate abilities as a criminal analyst," he too concluded that the blood-alcohol concentration in defendant's blood sample was 0.09 percent. (*Ibid*.) At the

31

prosecution's request, the trial court admitted into evidence a copy of Peña's laboratory report. (*Ibid*.) Defendant objected to the admission of Peña's report and Willey's testimony about its contents. (*Lopez, supra,* at pp. 574, 584.)

This court reversed the *Lopez* defendant's conviction, and our Supreme Court reversed our decision, holding that "the critical portions of [Peña's] report were not made with the requisite degree of formality or solemnity to be considered testimonial." (*Lopez, supra*, 55 Cal.4th at p. 582.) The Supreme Court noted that pages 2 through 6 of Peña's six-page report "consist[ed] entirely of data generated by a gas chromatography machine to measure calibrations, quality control, and the concentration of alcohol in a blood sample." (*Id*. at p. 583.) The court stated that, "[e]ven though nontestifying analyst Peña's signature appear[ed] on the laboratory report's second page (the printout of the machine's calibrations) and the remaining pages [bore] the handwritten initials 'JRP' (presumably Jorge Peña's initials), no statement by Peña, express or implied, appear[ed] on any of those pages." (*Id*. at p. 583.) The *Lopez* court also noted that the report's first page was a chart containing handwritten information by the testing analyst, including information filled in by a laboratory assistant (Brian Constantino, whose initials appeared at the top of the page) that included defendant's name, the laboratory number given to defendant's blood sample, the date and time the sample was collected, and the date and time the sample was received at the laboratory. (*Ibid*.) The Supreme Court further noted in *Lopez* that Peña's initials appeared in a box on page 1 that bore the heading "Ana[lyzed] By," and the chart contained information apparently entered by Peña which "show[ed] . . . the results of the blood analysis (0.09), indicating that defendant's blood

32

sample had a blood-alcohol concentration of 0.09 percent." (*Lopez*, *supra*, 55 Cal.4th at pp. 583-584.)

In holding that the critical portions of Peña's lab report were not made with the requisite degree of formality or solemnity to be considered testimonial, the *Lopez* court reasoned that "neither [the laboratory assistant] nor Peña signed, certified, or swore to the truth of the contents of page 1 of the report." (*Lopez, supra,* 55 Cal.4th at p. 584.) It also noted that, based on the lab assistant's labeling of defendant's blood sample and the machine-generated results for that sample, the prosecution expert witness (Willey) "gave his independent opinion—reflecting his 'separate abilities as a criminal analyst'—that defendant's blood sample contained 0.09 percent alcohol." (*Ibid.*)

Here, in light of the Supreme Court's holding and reasoning in *Lopez*, *supra*, 55 Cal.4th 569, we conclude that the out-of-court test results contained in what prosecution criminalist Kowal referred to as the notes and paperwork of nontestifying criminalist Kaleuati, like the critical portions of the lab report of nontestifying criminalist Peña in *Lopez*, lacked the requisite degree of formality or solemnity to be considered testimonial for purposes of the confrontation clause of the Sixth Amendment. Kowal's testimony showed that, with respect to Firman's black sweatshirt that Kaleuati tested, Kaleuati's notes and paperwork contained a list of particles and the accompanying spectra images produced by the calibrated energy dispersive X-ray spectrometer that Kaleuati used to analyze the particulate matter lifted from the sweatshirt. The notes also contained Kaleuati's finding, based on the instrument-generated results, that the instrument had detected a few characteristic particles of gunshot residue, as well as many consistent

33

particles, on the black sweatshirt. However, nothing in the record indicates that Kaleuati "signed, certified, or swore to the truth of the contents" (*Lopez*, *supra*, 55 Cal.4th at p. 584) of her notes and related paperwork. Unlike the testimonial certificates of analysis that were sworn to before a notary public by the laboratory analysts in *Melendez-Diaz* (*supra*, 557 U.S. at p. 308), Kaleuati's notes and paperwork lack the requisite degree of formality or solemnity to be considered testimonial.

We reject Firman's assertions that Kowal did not form or express her own opinion and that after she reviewed Kaleuati's notes she simply agreed with Kaleuati's test findings that there were characteristic particles of gunshot residue on the test sample taken from Firman's black sweatshirt. The record shows that, like the prosecution criminalist in *Lopez* who formed his own expert opinion based on the nontestifying criminalist's lab report (see *Lopez*, *supra*, 55 Cal.4th at p. 574), Kowal rendered her own independent opinion that the black sweatshirt tested positive for gunshot residue. Specifically, Kowal testified that her role with respect to the black sweatshirt that Kaleuati tested was to act as the technical reviewer. Kowal stated that she reviewed all of Kaleuati's notes and paperwork regarding the work done on the sweatshirt. She also explained that she went to the instrument where [Kaleuati] performed this analysis and [she] reviewed the images that [Kaleuati] collected and the spectra she collected for each of the items─for each of the particles she saved to come to her conclusion. When the prosecutor asked Kowal whether she agreed with Kaleuati's findings after looking at the data, Kowal replied, "Yes, I did."

Kowal's foregoing substantial testimony shows that she performed her own analysis based on the scientific data contained in Kaleuati's notes and the instrument-generated list of particles and related spectra images to reach her independent opinion that the black sweatshirt tested positive for gunshot residue. We also conclude Kowal properly relied on those notes and data as the basis for her expert opinion. "Expert testimony may . . . be premised on material that is not admitted into evidence so long as it is material of a type that is reasonably relied upon by experts in the particular field in forming their opinions." (*People v. Gardeley* (1996) 14 Cal.4th 605, 618, citing Evid. Code, § 801, subd. (b).) "[A]n expert witness whose opinion is based on such inadmissible matter can, when testifying, describe the material that forms the basis of the opinion." (*Gardeley*, *supra*, 14 Cal.4th at p. 618.)

For all of the foregoing reasons, we reject Firman's claim of constitutional error. In light of our determination that Kaleuati's out-of-court statements lack the requisite degree of formality or solemnity to be considered testimonial, we need not consider the primary purpose of those statements. (*Lopez*, *supra*, 55 Cal.4th at p. 582 ["[W]e need not consider the primary purpose of [the] nontestifying analyst['s] laboratory report . . . because . . . the critical portions of that report were not made with the requisite degree of formality or solemnity to be considered testimonial."].)

IV. *SALINAS'S CLAIM OF INEFFECTIVE ASSISTANCE OF COUNSEL (FAILURE TO REQUEST VOLUNTARY INTOXICATION INSTRUCTION)*

Salinas separately contends his count 4 conviction of robbing Nathaniel Green should be reversed because his trial counsel provided ineffective assistance by

prejudicially failing to request a jury instruction on voluntary intoxication as a defense to this specific intent crime. We reject this contention.

A. *Applicable Legal Principles*

1. *Ineffective assistance of counsel*

The law governing Salinas's ineffective-assistance-of-counsel claim is settled. A criminal defendant is constitutionally entitled to effective assistance of counsel. (U.S. Const., 6th Amend.; Cal. Const., art. I, § 15; *Strickland v. Washington* (1984) 466 U.S. 668, 684-685 (*Strickland*); *People v. Frye* (1998) 18 Cal.4th 894, 979.) To establish a denial of the right to effective assistance of counsel, a defendant must show (1) his or her counsel's performance was below an objective standard of reasonableness under prevailing professional norms, and (2) the deficient performance prejudiced the defendant. (*Strickland*, at pp. 687, 691-692; *Frye*, at p. 979.)

To demonstrate prejudice, a defendant asserting an ineffectiveness claim on appeal must show a reasonable probability he or she would have received a more favorable result had counsel's performance not been deficient. (*Strickland*, *supra*, 466 U.S. at pp. 693-694; *People v. Frye*, 18 Cal.4th at p. 979.) "A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland*, at p. 694.)

*Strickland* explained that "[j]udicial scrutiny of counsel's performance must be *highly deferential* [because] [i]t is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." (*Strickland*, *supra*, 466 U.S. at p. 689,

36

italics added.)  *Strickland* also explained that reviewing courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'"  (*Ibid.*)

"Generally, failure to object is a matter of trial tactics as to which we will not exercise judicial hindsight."  (*People v. Kelly* (1992) 1 Ca1.4th 495, 520 (*Kelly*).)  In *Kelly*, the California Supreme Court explained that "'[w]hen a defendant makes an ineffectiveness claim on appeal, the appellate court must look to see if the record contains any explanation for the challenged aspects of representation.  If the record sheds no light on why counsel acted or failed to act in the manner challenged, "unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation" [citation], the contention must be rejected.'"  (*Ibid.*)  Thus, "[a] reviewing court will not second-guess trial counsel's reasonable tactical decisions."  (*Ibid.*)

B.  *Analysis*

Asserting that the question of whether he formed the specific intent that is an element of the robbery offense charged in count 4 was "a crucial issue in this case," Salinas claims his trial counsel should have requested an instruction on voluntary intoxication as a defense to this specific intent crime because "there was substantial evidence [he] was intoxicated at the time of the robbery."  He asserts that "the eyewitnesses on count 4 testified the robbers were intoxicated." Specifically, he points to one witness's testimony that the robbers' eyes were "glossy or like they were on drugs or

37

something," and he also relies on victim Green's testimony that they were "all wigged," their eyes were "bulking out like they were on drugs," and they "looked crazy." Salinas also relies on the recording of his jailhouse conversation with informant Magana (discussed, *ante*), which was played for the jury and shows he told Magana that he (Salinas) was "'fucked up' during the robbery." In an extremely conclusory manner, Salinas asserts "[i]t appears reasonably probable that [he] would have achieved a more favorable result had an intoxication instruction been presented to the jury."

Salinas's claim of ineffective assistance of counsel is meritless. "'Robbery is the taking of "personal property in the possession of another against the will and from the person or immediate presence of that person accomplished by means of force or fear and *with the specific intent permanently to deprive such person of such property*."'" (*People v. Clark* (2011) 52 Cal.4th 856, 943, italics added.)

Section 29.4, subdivision (b), provides in part: "Evidence of voluntary intoxication is admissible solely on the issue of whether or not the defendant actually formed a required specific intent . . . ." The California Supreme Court has explained that a defendant is entitled to an instruction on voluntary intoxication as a defense to a specific intent crime "only when there is substantial evidence of the defendant's voluntary intoxication *and the intoxication affected the defendant's 'actual formation of specific intent*.'" (*People v. Williams* (1997) 16 Cal.4th 635, 677, italics added.)

Here, Salinas has failed to meet his burden of showing his counsel's performance was deficient because he has failed to demonstrate he was entitled to an instruction on voluntary intoxication as a defense to the specific intent crime of robbery. Salinas cannot

38

meet this burden merely by citing evidence he was voluntarily intoxicated; he must cite also evidence showing the claimed intoxication affected his "'actual formation of specific intent.'" (*People v. Williams*, *supra*, 16 Cal.4th at p. 677.) Salinas has failed to do so. *Williams* is instructive. In that case, a jury convicted the defendant of four counts of first degree murder. (*Id.* at p. 647.) On appeal the defendant claimed the trial court erred in refusing his request for an instruction on voluntary intoxication as a defense to a specific intent crime. (*Id.* at p. 677.) In support of his claim, the defendant pointed both to a witness's testimony that he was "probably spaced out" on the morning of the killings and to comments the defendant had made in a recorded interview with police that he was "doped up" and "smokin' pretty tough then" at the time of the killings (*Ibid.*) The Supreme Court rejected the defendant's claim of instructional error and stated: "Assuming this scant evidence of defendant's voluntary intoxication would qualify as 'substantial,' *there was no evidence at all that voluntary intoxication had any effect on defendant's ability to formulate intent*." (*Id.* at pp. 677-678, italics added.)

Here, Salinas cites substantial evidence from which a reasonable trier of fact could find he was voluntarily intoxicated at the time of the charged robbery. However, like the defendant in *People v. Williams*, he has presented "no evidence at all that voluntary intoxication had any effect on [his] ability to formulate intent." (*People v. Williams*, *supra*, 16 Cal.4th at p. 678.)

Salinas has also failed to overcome the strong presumption that, "under the circumstances, [his counsel's] challenged action 'might be considered sound trial strategy.'" (*Strickland*, *supra*, 466 U.S. at p. 689.) As already discussed, "[a] reviewing

court will not second-guess trial counsel's reasonable tactical decisions." (*Kelly*, *supra*, 1 Ca1.4th at p. 520.) Here, the record shows Salinas's failure to request an instruction on voluntary intoxication as a defense to the specific intent crime of robbery "'might be considered sound trial strategy.'" (*Strickland*, at p. 689.) In her closing argument, Salinas's counsel argued as follows that Salinas was not at the scene of the robbery and that, even if he was, he was not one of the robbers:

> "*We certainly don't know anything beyond a reasonable doubt as to Mr. Salinas's involvement in the robbery—at least from the Lopez brothers, I don't know if it can be established that Mr. Salinas was there*. They talked about five guys being present: Joker, Downer, Creeper, Terco, and an old, bald guy in a tank top. [¶] Now, if you believe Paul Salinas was there for whatever reason beyond a reasonable doubt, then you have to ask what his participation was beyond a reasonable doubt, or what his knowledge of what was going on has been proved beyond a reasonable doubt. We know it was dark out there. We know everything happened relatively quickly or fast. From the Lopez brothers' testimony it seems—or it appears that Creeper and Downer were the two guys doing the stuff—doing the robbery and maybe the old, bald guy in the tank top. Okay? *None of those are Mr. Salinas*." (Italics added.)

Salinas's counsel also argued:

> "When you are deciding the robbery and whether or not Mr. Salinas was there and whether or not he participated, please look at the jury instruction on aiding and abetting, CALCRIM [No.] 401. It talks about mere presence not being enough—not being enough to convict him if he's merely at the robbery. They need facts. They need evidence beyond a reasonable doubt as to what Mr. Salinas either did or helped somebody else do."

The foregoing statements by Salinas's counsel during closing argument show that Salinas's defense theory at trial was that he was not present at the time of the robbery and, even if he was, he did not participate in the robbery. Under these circumstances, the

defense of voluntary intoxication would have been relevant only if Salinas was present at the time of the robbery and had participated in that crime with the requisite intent to steal either as a perpetrator or as an aider and abettor. For Salinas's counsel to have claimed, by requesting an instruction on voluntary intoxication, that Salinas participated in the robbery but he was too intoxicated to form the specific intent to steal from Nathaniel Green would have been inconsistent with Salinas's defense theory. Accordingly, "we cannot say that defense counsel had no rational tactical purpose in not requesting an instruction on intoxication." (*People v. Wader* (1993) 5 Cal.4th 610, 643 [rejecting defendant's claim his counsel provided ineffective assistance by failing to request a voluntary intoxication instruction because such a request "would have been inconsistent with defendant's theory of the case"].)

For all of the foregoing reasons, we conclude Salinas has failed to meet his burden of establishing his trial counsel's performance was deficient. Even if we were to assume Salinas had met this burden, we would conclude he has failed to meet his additional burden of showing a reasonable probability he would have received a more favorable result as to count 4 had his counsel's performance not been deficient. (See *Strickland*, *supra*, 466 U.S. at pp. 693-694.) As already noted, Salinas's attempt in his opening brief to meet his burden of showing prejudice consists solely of his conclusory statement that "[i]t appears reasonably probable that [he] would have achieved a more favorable result had an intoxication instruction been presented to the jury." Such an argument is patently insufficient, borders on the frivolous, and alone renders meritless his claim of ineffective assistance of counsel. The absurdity of Salinas's unsupported claim of prejudice is shown

41

by the following excerpt from his recorded jailhouse statements to Magana recounting the details of his participation in the robbery:

> "They was trying to get me on the robbery fool. But they had, they had no, no shit on me you know? But *we did a robbery* with Tuerco, fucking Joker and Downer and fucking (unintelligible)[.] Ten people (unintelligible)[.] I was fucked up. *I said all your mutha fucken Niggas get on the wall right now, they go by the wall one by one, pocket search sucka.* 'What you got?' Came up on a I-Pod Touch, I-Pod Touch, I came up on eye drops, some cologne, feria, I came up on all kinds of shit dog. *I split the feria with Joker, Tuerco and Downer* . . . . [¶] . . . [¶] It was like fucken fifty something bucks dog. Petty chump change dog, but we came up on a lot of shit though umm. I-Pod, cell phone. [¶] . . . [¶] All kinds of shit . . . . I came up even on a fucken Black and Mild dog. Some bullshit some petty shit dude. They was some broke ass fools dog, broke ass niggas dog." (Italics added.)

In his reply brief, Salinas does not challenge the Attorney General's argument that the foregoing excerpt demonstrates Salinas "cannot show he was prejudiced given his recorded statements about the robbery."

## V. *SALINAS'S SECTION 654 SENTENCING ERROR CLAIM* (*COUNT 3*: *UNLAWFUL POSSESSION OF A FIREARM*)

Last, Salinas claims the court erred by not staying under section 654 the execution of the consecutive prison sentence of two years four months it imposed for his count 3 conviction of unlawful possession of a firearm for the benefit of a criminal street gang (former § 12021, subd. (d); § 186.22(b)(1)) because he acted with the same objective and intent when he committed this offense and the murder of the victim (count 1). This claim is unavailing.

42

A.  *Section 654*

Section 654, subdivision (a) provides in part:  "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision."

Section 654 "precludes multiple punishment for a single act or omission, or an indivisible course of conduct" (*People v. Deloza* (1998) 18 Cal.4th 585, 591) and ensures the defendant's punishment will be commensurate with his or her criminal culpability (*People v. Kramer* (2002) 29 Cal.4th 720, 723).  If a defendant suffers two convictions and punishment for one is barred by section 654, "that section requires the sentence for one conviction to be imposed, and the other imposed and then stayed." (*Deloza*, at pp. 591-592.)

Whether a course of conduct is indivisible for purposes of section 654 depends on the intent and objective of the defendant, not the temporal proximity of the offenses. (*People v. Hicks* (1993) 6 Cal.4th 784, 789.)  Generally, if all the criminal acts were incident to one objective, then punishment may be imposed only as to one of the offenses committed.  (*People v. Rodriguez* (2009) 47 Cal.4th 501, 507; *People v. Garcia* (1995) 32 Cal.App.4th 1756, 1781.)

1. *Standard of review*

In reviewing the trial court's determination whether section 654 precludes multiple punishment, we apply the deferential substantial evidence standard of review.  (*People v. Hutchins* (2001) 90 Cal.App.4th 1308, 1312.)  We must view the evidence in the light

43

most favorable to the sentencing order and presume in support of that order the existence of every fact that reasonably could be deduced from the evidence. (*Id*. at pp. 1312-1313.)

B. *Analysis*

In support of his claim that the court erred by not staying under section 654 the execution of the sentence it imposed for his count 3 conviction of unlawful possession of a firearm for the benefit of a criminal street gang, Salinas asserts "it is clear" that Joker Ortega, a member of the City Heights Juniors gang (see fn. 3, *ante*), "provided the gun to [Salinas] and dropped [him] and Firman off" near the scene of the shooting *before* Salinas and Firman confronted the murder victim. Also asserting─based primarily on the prosecutor's closing argument─that Ortega gave him the gun "because Ortega was tired of the Eastside gang members being in his area and he wanted them taken care of," Salinas contends "[t]he commission of the murder and the possession of the firearm are indivisible because the gun was specifically provided to [him] shortly prior to the shooting for the purpose of accomplishing or facilitating the shooting." This contention is unavailing.

"A violation of [former section 12021] is a relatively simple crime to commit[.] [T]he crime is committed the instant the felon in any way has a firearm within his control." (*People v. Ratcliff* (1990) 223 Cal.App.3d 1401, 1410, italics omitted.) "After reviewing the relevant California authorities, *Ratcliff* distilled the rule . . . that section 654 operates to bar multiple punishment where the evidence shows that the firearm came into the defendant's possession fortuitously 'at the instant of committing another offense.'" (*People v. Jones* (2002) 103 Cal.App.4th 1139, 1145, quoting *Ratcliff*, *supra*, at p. 1412.)

44

"On the other hand, it is clear that multiple punishment is proper where the evidence shows that the defendant possessed the firearm before the crime, with an independent intent." (*Jones*, at p. 1144.)

"'Whether a violation of [former] section 12021 . . . constitutes a divisible transaction from the offense in which [the defendant] employs the weapon depends upon the facts and evidence of each individual case. [W]here the evidence shows a possession distinctly antecedent and separate from the primary offense, punishment on both crimes has been approved.'" (*People v. Bradford* (1976) 17 Cal.3d 8, 22.)

Here, as noted, Salinas acknowledges he obtained possession of the gun *before* he and Firman encountered the victim. Thus, his count 3 offense of unlawfully possessing that firearm was complete before the victim was shot and killed. (See *People v. Ratcliff*, *supra*, 223 Cal.App.3d at p. 1410.) The "evidence" Salinas relies on in support of his assertion that Ortega gave him the gun "for the purpose of accomplishing or facilitating the shooting" consists of an argument made by opposing counsel. As Salinas has failed to meet his burden of showing his intent and objective at the time he took taking possession of the gun, and he admits he took possession of the gun before he and Firman encountered the murder victim, we conclude the court did not abuse its discretion in punishing Salinas for both the firearm possession offense (count 3) and the murder (count 1). (*People v. Bradford*, *supra*, 17 Cal.3d at p. 22; *People v. Jones*, *supra*, 103 Cal.App.4th at p. 1145.)

## DISPOSITION

The judgments are affirmed.

NARES, J.

WE CONCUR:

BENKE, Acting P. J.

McINTYRE, J.